**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 3:70-CV-04101-O |
| | § | ECF |
| RICHARDSON INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**MOTION FOR DECLARATION OF UNITARY STATUS AND BRIEF IN SUPPORT**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant Richardson Independent School District ("RISD" or the "District") and its Board of Trustees, file this Motion for Declaration of Unitary Status and Brief in Support (the "Motion") and respectfully request that this Honorable Court dismiss the 1970 Order (the "Desegregation Order") of the Court, as modified and amended, declare RISD to be a unitary school district, and release the District from further court supervision. The Board of Trustees of RISD (the "Board") does not make this request lightly and has worked diligently over the last forty-one years to comply in good faith with the Desegregation Order and to eliminate any remaining vestiges of *de jure* segregation to the extent practicable from the District while increasing educational opportunities for *all* students in RISD.

## I.   LEGAL STANDARD FOR UNITARY STATUS

### A.   U.S. Supreme Court Precedent for Unitary Status

1.       This case involves a forty-one year old desegregation order. By this motion, RISD asks that this Court find that the District has achieved unitary status, and in doing so, dissolve the Desegregation Order, as amended, and remove RISD from further federal court supervision under the Desegregation Order. In *Dowell*, the U.S. Supreme Court emphasized that

federal judicial supervision of local school systems was intended as a "temporary measure."[1]  In *Freeman v. Pitts*, the Supreme Court reiterated that "although this temporary measure has lasted decades, the ultimate objective has not – to return school districts to the control of local authorities."[2]

       *a.*      *Unitary Status*

2.      The U.S. Supreme Court has established criteria that a school district must meet to achieve the "ultimate objective" of unitary status.  To determine whether the Desegregation Order should be dissolved, the Court must address two basic questions: (1) whether the RISD has complied in good faith with the desegregation orders of this Court for a reasonable period of time,[3] and (2) whether the vestiges of the prior segregated system have been eliminated to the extent practicable.[4]

3.      In further considering whether the vestiges of past segregation have been eliminated to the extent practicable, the district court must look to "every facet of school operations---student assignment, faculty, staff, transportation, extracurricular activities and facilities."[5] These criteria are commonly referred to as the "*Green* factors" and they are among the most important indicia of whether a school district remains segregated.[6] "Existing policy and practice with regard to faculty, staff, transportation, extracurricular activities and facilities [are] among the most important indicia of a segregated system."[7]  In further defining the contours of "unitariness," the Supreme Court approved consideration of another indicia, "quality of education," as an important factor in determining whether a school district has fulfilled its

---

[1]     *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 247 (1991).
[2]     *Freeman v. Pitts*, 503 U.S. 467, 489 (1992).
[3]     "In deciding whether to modify or dissolve a desegregation order, a school board's compliance with previous court orders is obviously relevant." *Dowell*, 498 U.S. at 249.
[4]     *Id*. at 250*; Freeman*, 503 U.S. at 490-491.
[5]     *Green v. County School Board*, 391 U.S., 430, 435 (1968); *Dowell*, 498 U.S. at 250.
[6]     *Swann v. Charlotte-Mecklenberg Bd. of Education*, 402 U.S. 1, 18 (1971).
[7]     *Id*.

obligations under the desegregation order, explaining "that the *Green* factors need not be a rigid framework."[8]

        *b.*     *Incremental Unitary Status*

4.      In 1976 the Supreme Court held that a school district could achieve unitary status on an incremental basis with respect to each of the *Green* factors.   In *Pasadena Board of Education*, the Supreme Court held that the district court exceeded its remedial authority in requiring the school district to make annual adjustments of school attendance zones where the changes in the racial makeup of the schools were caused by demographic population shifts that were the "normal pattern of human migration" and "not attributed to any segregative acts on the part of the [school district]."[9]   The Supreme Court focused on the fact that the district court had approved a plan designed to obtain racial neutrality in the attendance of students in the public schools and that the school district had achieved the student assignment objective under the plan. The Supreme Court therefore reasoned that the district court was not entitled to require the school district to annually rearrange attendance zones so as to ensure the racial mix desired by the court.[10]   Once the racially neutral attendance pattern was implemented to remedy the perceived constitutional violations, the district court had fully performed its function of providing the appropriate remedy,[11] and the school district was entitled to relief from the district court's injunction.[12]

5.      In *Freeman v. Pitts*, the Supreme Court declared:

> Today we make explicit the rationale that was central in *Spangler*.
> A federal court in a school desegregation case has the discretion to

---

[8]     *Freeman*, 503 U.S. at 482-483, 493.
[9]     *Pasadena Board of Education v. Spangler*, 422 U.S. 424, 436 (1976).
[10]    *Id.*
[11]    *Id.* at 437.
[12]    *Id*. at 440.

order an incremental or partial withdrawal of its supervision and control.[13]

* * *

In the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations.[14]

* * *

Upon a finding that a school system subject to a court–supervised desegregation plan is in compliance in some but not all areas, the court in appropriate cases may return control to the school system in those areas where compliance has been achieved, limiting further judicial supervision to operations that are not yet in full compliance with the court decree.[15]

c.      *Relinquishing Federal Court Supervision*

6.      Emphasizing its holdings in *Dowell* and *Freeman*, that federal judicial supervision is intended only as a "temporary measure" where "ultimate objective is to return school districts to the control of local authorities" once compliance has been achieved, the Supreme Court rejected the concept that "racial balance is to be achieved for its own sake," and cautioned as unwarranted the idea that "heroic measures must be taken to ensure racial balance when the racial balance is attributable neither to the prior *de jure* system nor to a later violation by the school district, but rather to independent demographic forces."[16] "Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors."[17]

7.      Moreover, the Court warned that "as the *de jure* violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial

---

[13]      *Freeman*, 503 U.S. at 489.
[14]      *Id*. at 490.
[15]      *Id*. at 491.
[16]      *Id*. at 493-494.
[17]      *Id*. at 494.

imbalance in a school district is a vestige of the prior *de jure* system.  The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith."[18]  The Court recognized that "a history of good faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation" and therefore further court supervision should be terminated.[19]

8.    In *Milliken*, the Supreme Court said:

> Federal-court decrees must directly address and relate to the constitutional violation itself.  Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation …[20]

9.    In *Dowell*, the Supreme Court reiterated that desegregation decrees "are not intended to operate in perpetuity."[21]

> The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by the local authorities.  Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that 'necessary concern for the important values of local control of public school system dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.(citations omitted)[22]

**B.    Precedent for Unitary Status in the Fifth Circuit**

10.    The Fifth Circuit has fully implemented the legal precedent set forth in *Dowell* and *Freeman* and other Supreme Court cases for a school district to achieve unitary status.  The Fifth Circuit considers both good faith compliance with the desegregation order for a reasonable

---

[18]    *Id*. at 496.
[19]    *Id*. at 498.
[20]    *Milliken v. Bradley*, 433 U.S. 267, 282 (1977).
[21]    *Dowell*, 498 U.S. at 248.
[22]    *Id.*

period of time and elimination of the vestiges of the former dual system to the extent practicable

necessary for unitary status to be achieved.  In 1993, the Fifth Circuit adopted the reasoning in

*Dowell* and *Freeman*:

> *Freeman* and *Dowell* make clear, however, that there is no longer
> magic in the phrase unitary status, which had spawned much
> uncertainty and a conflict among the circuits.  Following *Freeman*,
> the lower courts have discretion to terminate a desegregation case
> if a **school board has consistently complied with a court decree
> in good faith and has eliminated the vestiges of past
> discrimination to the extent "practicable."**  *Freeman* created a
> framework in which equitable decrees will not remain in effect
> perpetually and school districts can be returned to local control.
> **We believe the same considerations --- good faith compliance,
> practicability of further desegregation, and local control – are
> also pertinent** to determining whether a particular school board
> action, in a district that has long lived with a desegregation decree
> but failed to seek dismissal of the case, sufficiently comports with
> the goals of the decree.  **The tests of practicability and good
> faith should inform, as they did here, a district court's exercise
> of its equitable powers where a desegregation decree has been
> in effect for some years.**[23] (emphasis added)

11.    In prior decisions, the Fifth Circuit considered 13 to 25 years a reasonable period

of time for compliance with a desegregation order.[24]

12.    The Fifth Circuit also held that unitary status can be achieved on an incremental

basis with respect to each *Green* factor.[25]  Moreover, the Fifth Circuit agrees that when a school

district achieves incremental unitary status, the court should abdicate its supervisory role as to

the aspect of the desegregation plan proclaimed unitary.[26]

---

[23]    *Hull v. Quitman County School Bd. of Educ.* 1 F.3d 1450, 1454 (1993).

[24]    *Ross v. Houston Independent School District*, 699 F.2d 218, 219 (5th Cir. 1983) (25 years); *Fort Bend ISD
v. City of Stafford*, 651 F.2d 1133, 1135 (5th Cir. 1981) (16 years); *Flax v. Potts*, 915 F.2d 155, 158 (5th Cir. 1990)
(15 years); *Hull v. Quitman County Board of Education*, 1 F.3d 1450, 1452 (5th Cir. 1993) (24 years); *U.S. v.
Overton,* 834 F.2d 1171, 1173 (5th Cir. 1987) (13 years); and *Quarles v. Oxford Municipal Separate School District*,
868 F.2d 750, 751 (5th Cir. 1989) (19 years).

[25]    *U.S. v. Overton*, 834 F.2d 1171, 1177 (5th Cir. 1987); *Ross*, 699 F.2d at 228.; *Flax*, 915 F.2d at 158.

[26]    *Overton*, 834 F.2d at 1174 ("achieving unitary status means that a school board is free to act without federal
supervision so long as the board does not purposefully discriminate."); *Flax*, 915 F.2d at 158 (a school system can

13.      Iterating the "ultimate objective" announced in *Freeman*, *supra*, the Fifth Circuit

agrees that relinquishing federal court supervision is appropriate when unitary status is achieved:

"the only thing certain about unitariness is its consequences: the *mandatory* devolution of power

to local authorities."[27]  (emphasis added).

     **C.**     **Monitoring Period**

14.      The Fifth Circuit has established monitoring procedures that must be followed by

the district court in making a determination of unitary status before it relinquishes supervision.

Before a finding of unitariness can be made, the plaintiffs are entitled to notice and a hearing

providing an opportunity to show cause why the school system is not unitary and why continued

supervision is necessary.[28]  In *Youngblood* the Fifth Circuit required that the school district be

monitored for at least three years to ensure compliance with the desegregation order.[29]

15.      In *Montielh*, the Fifth Circuit reversed the district court's finding of unitary status

because the court declared the school district "unitary" at the same time that it had entered the

desegregation order and did not follow the monitoring procedures set forth in *Youngblood*.[30]  In

*Price v. Austin Independent School District*, the district court entered a 1980 consent decree that

allowed for a monitoring period.  In approving the procedures followed in *Price*, the Fifth Circuit

described exactly how the *Youngblood* procedures work and defined the appropriate time for

when the monitoring period has been completed to achieve unitary status.  The desegregation

decree in *Price* provided that "for a period of three years *from the date of the entry of the*

---

achieve unitary status incrementally and when it does so, the court will abdicate its supervisory role as to the aspect
of the desegregation plan proclaimed unitary).
[27]      *Overton*, 834 F.2d at 1177 (when a court finds that discrimination has been eliminated root and branch
from school operations, it must abdicate its supervisory role).
[28]      *Youngblood v. Board of Public Instruction*, 448 F.2d 770, 771 (5th Cir. 1971); *Montielh v. St. Landry
Parish School Board*, 848 F.2d 625, 629 (5th Cir. 1988).
[29]      *Youngblood*, 448 F.2d at 771; *Montielh*, 848 F.2d at 629, (only after these procedures are followed may a
district court be sufficiently certain that a school system is unitary and dismiss the case).
[30]      *Montielh*, 848 F.2d at 629.

*Consent Decree*, the AISD shall remain under the jurisdiction of the court."[31]   (emphasis added)

The three-year monitoring period therefore commences *upon the entry of the decree.*   "Under the

consent decree, the [district court] would retain jurisdiction over the case for three years.   Upon

the expiration of the three-year period, subsequent to notice and opportunity to object, the AISD

would be declared a unitary school system and the case dismissed."[32]   On appeal, the Fifth

Circuit upheld the dismissal in *Price* holding that "the court complied with our rules *regarding*

*the appropriate time* to enter a finding of unitariness.   It retained jurisdiction over the case *for*

*three years from the 1980 consent decree* and provided notice and hearing prior to dismissal."[33]

(emphasis added)

16.      The Fifth Circuit has emphasized that "a finding of unitariness and dismissal

under *Youngblood* means that a school district has removed the taint of prior discrimination and

attained the same legal status as a district that never has discriminated"[34]   "The idea that a school

district can be declared unitary and yet be answerable to the federal courts for failure to abide by

desegregation plans, regardless of segregative purpose, is at war with itself." [35]

17.      RISD's forty-one year-old "monitoring period" is well past its prime and the time

is appropriate for the entry of a unitary status order.   RISD has been monitored and reported to

the Court for over forty years, has complied in good faith with the orders of this Court and has

eliminated the vestiges of the former dual system to the extent practicable.   Accordingly, it is

appropriate for this Court to declare RISD unitary, dissolve the 1970 Desegregation Order,

---

[31]      *Price v. Austin Independent School District*, 945 F.2d 1307, 1311 (5th Cir. 1991).
[32]      *Id.*; *see also Smiley v. Blevins*, 626 F. Supp. 2d. 659 (S.D. Tex. 2009) (district dismissed upon a finding of unitary status after it operated under a desegregation order for forty-eight years).
[33]      *Id.*
[34]      *Overton*, 834 F.2d at 1178.
[35]      *Id.* at 1177.

relinquish federal supervision and terminate any further monitoring of the school district's operations.

## II.     RISD HAS COMPLIED IN GOOD FAITH WITH THE DESEGREGATION ORDER(S) FOR A REASONABLE PERIOD OF TIME

18.      RISD has complied in good faith with the Court's desegregation orders for more than reasonable period of time - 41 years - since the orders were entered.[36]  During this lengthy period, RISD has carried out each of the orders entered by the Court.  Indeed, the record in this case has been substantively dormant since at least 1997 when the Court entered its last order in this case,[37] has been equally dormant for lengthy lapses of time in between 1975 to 1980 and 1980 to 1997,[38] has been remarkably free of any objections or dissent  from the Plaintiff about the District's desegregation efforts,[39] and devoid of any appeals of the Court's orders since at least 1979.[40]  Moreover, RISD has regularly sought and obtained court approval for changes to the school attendance plans designed to ensure that the school district was moving forward

---

[36]      *Dowell*, 498 U.S. at 249-250; *Freeman*, 503 U.S. at 498; *Anderson* at 297-298, (unitary status granted after good faith compliance with a desegregation order for forty years); *Smiley v. Blevins*, 626 F.Supp.2d 659, 660 (S.D. Tex. 2009) (unitary status granted after good faith compliance with a desegregation order for forty-eight years).

[37]      *See* Docket Sheet at 10.  In affirming the grant of unitary status, the Supreme Court noted the dormancy of the desegregation order "between 1969 and 1986, respondents sought only infrequent and limited judicial intervention into the affairs" of the school district.  *Freeman*, 503 U.S. at 473.

[38]      *See* Docket Sheet at 5-10.  During this period, the Court entered four orders approving changes in pupil attendance zones, one order removing a reporting requirement of the original 1970 order, and two orders appointing members to the Bi-Racial Advisory Committee.  All the orders were entered without objection by the Plaintiff. There is no record that those orders were violated by RISD.

[39]      *See* Docket Sheet at 1 through 12, and Docket Nos. 1 through 14, showing no objections filed by Plaintiff to the RISD's desegregation efforts since 1975.

[40]      After the initial 1970 Desegregation Order was entered, there was an appeal of the Court's order dealing with integration at Hamilton Park Elementary, a 100% Black school.  In 1975 the Fifth Circuit remanded the case with instructions that the racially segregated character of Hamilton Park Elementary be eliminated by the 1975-1976 school year.  In compliance, RISD submitted and the district court approved the Pacesetter Elementary Program to be located at Hamilton Park.  Neither party appealed this order.  The court record in this case shows no other appeals taken related to the desegregation efforts of RISD since 1975.  In affirming dismissal of a 20-year old desegregation order, the Fifth Circuit noted that civil rights complaints had been filed but no further action was taken.  *Quarles v. Oxford Municipal Separate School District*, 868 F.2d 750, 752 (5th Cir. 1989).

toward compliance with the Court's orders.[41]   In *Smiley*, the court found that "GISD's long, almost fifty-year, history of compliance with the court's orders to desegregate demonstrates that GISD has accepted the principle of racial equality and will not revert back to a dual school system . . . and has demonstrated a good-faith compliance with the court's order to desegregate."[42]   The same is true of RISD.  As the court in *Manning* observed: "the focus is on the school board's pattern of conduct, and not isolated events, because the purpose of the good-faith finding is to ensure that a school board has accepted racial equality and will abstain from intentional discrimination in the future."[43]

19.     On September 10, 1970, the Court entered the original Desegregation Order following the Fifth Circuit's August 18, 1970 decision in *United States v. Texas Education Agency*.  This Order (1) required RISD to continue to operate on the basis of the attendance zone system;[44] (2) approved RISD's request to close Hamilton Park Junior High School and revised the school attendance zones of three other junior high schools;[45] (3) required staff to be assigned in a desegregated manner; (4) required staff to be hired and treated without regard to race; (5) required that dismissal/demotion be based on objective, non-discriminatory criteria;[46] (6) established a plan for dismissal of personnel in connection with the desegregation plan; (7) established a majority to minority transfer policy; (8) required regular re-examination of RISD's

---

[41]     *Smiley*, 626 F. Supp. 2d. at 668 (In declaring the school district unitary, the district court acknowledged as good-faith compliance with the court's order the fact that the district had not been found in violation of the order and had regularly obtained court approval for changes in school plans.)

[42]     *Id.* at 669 (citing *Manning ex rel Manning v. School Board of Hillsborough County, Florida*, 224 F.3d 927, 946 n.33 (11th Cir. 2001), *cert. denied*, 534 U.S. 824 (2001)).

[43]     *Manning*, 224 F.3d at 946 n. 33.

[44]     The United States asked the Court to require RISD to pair Hamilton Park Elementary School and Stults Road Elementary School.  The Court, however, rejected the US's request. *See* Order at Docket Sheet 1.

[45]     In connection with the close of Hamilton Park Junior High School, the Order set forth amended attendance zones for Richardson JHS, Forest Meadow JHS, and Northwood JHS.  *See* Order, Docket Sheet at 2.

[46]     In connection with dismissal pursuant to a reduction in force, the 1970 Order required the school board to develop non-racial and objective criteria to be used in selecting who would be dismissed and the criteria must be available for public inspection and maintain evaluations of the staff members under this criteria.  *See* Order, Docket Sheet at 3.

transportation system to ensure bus routes and assignment of students to buses was done on a non-segregated and non-discriminatory basis; (9) required school construction, school consolidation and site selection for schools and classrooms in a manner to prevent a dual school structure and to promote complete desegregation; (10) mandated that student transfers in and out of the district be on a non-discriminatory basis and whose cumulative effect would not reduce desegregation; (11) eliminated segregation in classroom, non-classroom, and extracurricular activities; and (12) created a Bi-Racial Committee to discuss ways of achieving interracial harmony and to serve as an advisory body to the School Board and the Court.  An appeal was taken of this order.

20.       Following the appeal, the Court entered several orders affecting Hamilton Park Elementary.  On June 20, 1975, RISD filed a Proposed Arrangement to the Court required by the Fifth Circuit's April 24, 1975 remand decision which ordered that Hamilton Park Elementary School be desegregated at the beginning of the 1975-1976 school year.[47]  At the time, the school was 100% Black.   RISD complied and submitted the Pacesetter Elementary Program to be conducted at Hamilton Park Elementary School to draw students from all over RISD and to pair Hamilton Park Elementary School with Dobie Elementary School.   RISD represented that the educational opportunities and quality of the Pacesetter Program would draw a number of white students outside the Hamilton Park Elementary attendance zone which "will equal and eventually exceed the number of black students attending Hamilton Park Elementary School."[48]  RISD also represented that it would begin actively recruiting students to Hamilton Park.   RISD proposed three different plans for the pairing of the two elementary schools.  On July 16, 1975, the District Court entered an Order approving RISD's Pacesetter Elementary Program at Hamilton Park

---

[47]       *See United States v. Texas*, 512 F.2d 896 (5th Cir. 1975).
[48]       *See* Proposed Arrangement at 3.

Elementary and set forth specific enrollment limits and criteria to ensure that Hamilton Park would not be more than 50% Black.

21.     On August 13, 1975, the District Court approved and implemented the Pacesetter Elementary Program and entered an Order acknowledging that RISD "has complied with this Court's order of July 16, 1975," and "met or exceeded the requirements of said order."[49] Thereafter, the Court issued Supplemental Orders on August 19, 1975, and August 11, 1976, which governed the enrollment at Hamilton Park Elementary School for subsequent school years and required that: (1) no more than 600 students could attend Hamilton Park in grades one to six; (2) no classroom should have more than 50% black students; and (3) acceptance of students was based on a priority basis set forth in the order.  On May 12, 1976, the Court entered an Order for Additional Selection Criteria, which directed RISD to provide additional selection criteria for voluntary enrollment in the Pacesetter Elementary Program to assure the male-female ratio at Hamilton Park was substantially the same as throughout RISD.  The Court's docket shows that RISD complied with those orders and there is no history of noncompliance.

22.     On October 7, 1980, the Court entered an Order modifying the reporting requirements in the order of July 16, 1975, for the Pacesetter Elementary Program.  It required the RISD School Board to file a report showing the number of students, by race, assigned to each classroom and grade at Hamilton Park – to be filed two times a year (within two weeks after the official beginning date of each school semester).  In the history of the Pacesetter Elementary Program at Hamilton Park Elementary, there has never been a finding of noncompliance by the Court or any objection filed by the Plaintiff.

---

[49]     *See* Docket Sheet at 2-A.

23.     After six years of compliance with the 1970 Desegregation Order, on May 25, 1976, the Court entered an Order relieving RISD from reporting annually the number of students by race enrolled in each classroom in each of the schools in the District. [50]

24.     The 1970 Order also established reporting provisions requiring RISD to report to the Court annually on April 15th: (1) the number of students by race enrolled in the district; (2) the number of students by race enrolled in each school of the district; (3) the number of students by race enrolled in each classroom in each school;[51] (4) the number of full-time teachers by race in the district; (5) the number of full-time teachers by race in each school in the district; (6) the number of part-time teachers by race in the district; (7) the number of part-time teachers by race in each school in the district; (8) the number of inter-district transfers, the race of the transferees, and the school where they transferred; (9) whether the transportation system is desegregated; (10) whether all facilities at the schools are being operated on a desegregated basis; (11) descriptions of present/proposed construction; (12) any school board abandonment or disuse of any school property or building; and (13) whether there is a bi-racial advisory committee and any recommendations submitted by such bi-racial advisory committee to the board.

25.     In compliance with the reporting requirements of the 1970 Desegregation Order, from 1971 to 2011, RISD has submitted annual reports to the Court, reporting on the implementation of each of the items required under the Desegregation Order.  The reports were designed for RISD to chronicle its annual compliance with the Desegregation Order and RISD served each of its reports on the Plaintiff.  As deemed appropriate, the annual reports contained racial data on student assignments, current or proposed new school construction, renovations, closings and openings, pairing of schools, majority to minority and inter-district transfers, faculty

---

[50]     Docket Sheet at 3.  This requirement was eliminated by the May 25, 1976 Court order.

[51]     *Id.*

and staff, reassignment of academic programs, changes in school attendance zones and other similar factors.  The Court's record is devoid of any instance where the Plaintiff filed objections to any of these reports or alleged that RISD was not complying with the Desegregation Order or sought further relief from the Court.  Indeed, since at least 1980, over the past thirty-one years, the Court's docket on this case is devoid of any response much less objection by the Plaintiff to the Annual Reports filed with the Court, evidence that the RISD has faithfully complied with the desegregation orders.  Further, the last substantive order entered by the Court was on June 10, 1997, approving a student assignment plan.  In the fourteen years since that plan was approved, Plaintiff has not objected to RISD's implementation of and compliance with that order.[52]

26.     Apart from the foregoing orders dealing with Hamilton Park and Annual Reports, in the course of the desegregation process, and in full compliance with the 1970 Desegregation Order of the Court, RISD periodically sought and obtained court-approved modifications of student assignment plans between 1976 and 1981 and again in 1997.

27.     Specifically, in 1976 RISD requested and obtained court approval to place students at Brentfield, Prestonwood, and Mohawk Elementary schools to alleviate overcrowding at Bowie Elementary.[53]   In 1977, RISD sought and obtained approval to modify the pupil attendance zone of Stults Road Elementary[54] and the student attendance zones of Northlake Elementary, Wallace Elementary, and Lake Highlands Elementary schools.[55]  In separate orders entered in 1976 and 1977, the Court approved all of the above changes in school attendance zones.[56]  In 1978, 1979, 1980 and 1981, RISD sought and obtained court approval to modify

---

[52]     A couple of interim miscellaneous orders were entered in 1999 and 2000 approving the appointment of members to the Bi-Racial Advisory Committee.  *See* Docket Sheet at 10-12 and Docket Nos. 1-14, showing no objections filed by Plaintiffs from 1997 to the present.
[53]     Docket Sheet at 3.
[54]     Docket Sheet at 3-A.
[55]     *Id.*
[56]     *Id.* at 3 and 3-A.

student attendance zones for Richland Elementary, Dover Elementary, Richardson Heights Elementary, Moss Haven Elementary, Stults Road Elementary and other school attendance zones.[57]   In each, instance, the Court's record is entirely devoid of any objections being filed by the Plaintiff to the RISD's plans to modify student attendance zones.   Clearly, with court approval, none of these modified school attendance zones had either a resegregative effect or constituted new *de jure* violations of the Constitution.[58]

28.     For fifteen years, from 1982-1997, there were no further changes in school attendance zones, and there have been no complaints or intervention by the Plaintiff that RISD was not properly implementing or complying with the foregoing school attendance orders.

29.     In 1996, the RISD Board undertook another major change in the District's student assignment plan.   The plan was forward-looking and was designed to deal with the changed racial demographics of the district and a need to revise the facilities to accommodate future needs.   The Board adopted a new student assignment plan to go into effect in the 1997-1998 school year and was designed to be a 5-10 year plan.   Before the plan was implemented, it was vetted by RISD administration, community leaders, and the Court.   The new plan was the result of a careful demographic study conducted by RISD that included "a committee of RISD community members and administrators to study school enrollments, building capacities, space utilization, and various demographic data across the district for purposes of long-range planning."[59]   The committee was named the Long Range Space Needs Committee ("LRSNC").   The LRSNC researched student enrollment trends and building assignments across the district and visited fifty schools and auxiliary facilities including approximately 250 multi-family

---

[57]     *Id*. at 4, 4-A, 6 and 7, (motions filed by RISD and orders entered by the Court).
[58]     *Freeman*, 503 U.S. at 498 (good faith compliance with a court order is evidence that any current racial imbalance is not the product of a new *de jure* violation).
[59]     Docket Sheet at 10; RISD's Motion to Approve Proposed Student Assignment, filed April 15, 1997.

complexes in the RISD school attendance areas.  The LRSNC was to forecast student enrollment by neighborhood and school attendance areas.  The committee found a trend of high growth rates for many parts of the district, but especially in the Lake Highlands High School and Richardson High School attendance areas, where multi-family and low-income housing was most concentrated in the district.  The LRSNC also prepared a demographic analysis of each school in the district, including the school's racial makeup, size, instructional programs and special needs student population.  The LRSNC prepared a comprehensive report to the RISD Board that made recommendations on overcrowding, building under-utilization, imbalance in special needs services and program delivery, and the *promotion of diversity in student enrollment*.  This last component was of critical importance because by 1997, RISD's student racial makeup had undergone a vast demographic transformation from a majority white to a majority minority school district.

30.     The RISD Board presented the recommendations to the community in a series of publications and six open forum meetings to obtain public input.  The Board developed a proposed assignment plan that included the following goals: enhance academic excellence, *address changing demographics*; use common geographic landmarks for boundaries; maintain neighborhood elementary schools with a flexible secondary feeder system; eliminate gray areas; avoid splitting classes into separate feeder patterns; enhance utilization and adequacy of instructional space; and consider cost and operational efficiency.  Two more open Board meetings were held during which community input was received.  Eventually, a bond election was held and passed in September 1996 to provide finding for the proposed facilities and new student assignment plan.[60]

---

[60]     *Id.*

31.     The plan was submitted for approval on April 15, 1997[61] when the RISD filed a motion with the Court to obtain approval of the new student assignment plan and facilities renovation and construction.   The RISD informed the court that the "proposed student assignment plan . . . is the result of a concerted effort among the RISD citizens, administration and Board of Trustees."   Significantly, the RISD Board also obtained the approval of the Bi-Racial Advisory Committee previously appointed by the Court.[62]

32.     On June 10, 1997, the District Court entered an order approving the student assignment plan, noting especially that the RISD's plan had the approval of the "Plaintiff herein, the United States of America . . . and the bi-racial committee" of the RISD appointed by the Court.[63]

33.     In the fourteen-year span since the new student assignment and facilities plan was approved, the RISD has undertaken diligent efforts to comply with the Desegregation Order. During the past fourteen years, notably there have been no objections or complaints filed by the Plaintiff about the RISD's desegregation efforts and compliance with the 1997 order and certainly no finding of noncompliance has been made by the Court.[64]

34.     The latest efforts undertaken by RISD in 1996 and 1997 exemplify in its clearest form the District's adherence to the Supreme Court's precedent that a school district's "good faith commitment to the entirety of a desegregation plan so that parents, students and the public have assurance against further injuries…" is an important factor to be considered in deciding whether federal supervision should be relinquished. [65]   "A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation and enables the

---

[61]     *Id.*
[62]     *Id.*
[63]     Docket Sheet at 10; "Order Approving Student Assignment Plan," entered June 10, 1997.
[64]     Docket Sheet at 10-2 and Docket Nos. 1-14.
[65]     *Freeman*, 503 U.S. at 498.

district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future."[66]   RISD has demonstrated its commitment to good-faith compliance with the orders of this Court for a reasonable period of time.   Its faithful implementation of the school plans approved by this Court, with the approval of the Plaintiff, is further evidence that any remaining racial imbalances are "not the product of a new *de jure* violation" nor a vestige of the former system.   RISD believes it has met the criteria for unitary status under *Dowell* and *Freeman* and the applicable Fifth Circuit authority cited above, and is therefore entitled to release from federal court supervision.

35.       On April 4, 2008, the Department of Justice (the "DOJ") sent a letter requesting information about RISD's compliance with the Desegregation Order ("DOJ Data Request").   The DOJ indicated it needed the information as part of its oversight and monitoring obligations with respect to desegregation orders to which the United States is a party.   The DOJ Data Request overlapped the areas covered in the 1970 Order and the *Green* factors.   RISD submitted its written response to the DOJ Data Request on August 25, 2008, demonstrating RISD's compliance in each area of the District's operation covered by the 1970 Desegregation Order. RISD included with its response over 500 pages of supporting documentation.   On October 27, 2010, the DOJ served a supplemental request on RISD for further information relating to the district's compliance efforts under the order.   The DOJ's supplemental request for data and the information provided by RISD also covered every aspect of the 1970 Desegregation Order and the *Green* factors.   On December 14 - 17, 2009, the DOJ followed up its review of data by conducting an on-site inspection of the District's school facilities, transportation, and student academic and extra-curricular programs during which DOJ was provided access to each school campus they pre-selected and to conduct interviews of various school administrators, principals,

---

[66]       *Id.*

teachers and other staff.  In subsequent correspondence, DOJ advised RISD that it was aware of the concerns that had been raised by members of the Court-appointed Bi-Racial Advisory Committee.

36.     Following the on-site inspection, RISD contacted DOJ to obtain an assessment of the DOJ's findings and conclusions based on the data provided to them and the subsequent discovery conducted by DOJ.  The District was particularly focused on whether DOJ would agree to enter into an agreed motion that RISD has met its obligations under the 1970 Desegregation Order and has achieved full unitary status.  The DOJ and RISD have exchanged correspondence detailing their views on the question of unitary status, and have engaged in several telephone conferences to discuss their respective views on the empirical data provided to DOJ and any conclusions that could be drawn from that data, the applicable legal standards that govern the court's declaration of unitary status, and whether the parties could enter into any factual or legal stipulations.  Based on its comprehensive compliance review, including analysis of the District's responses to the information requests, site visits, and meetings with the community members,  the DOJ has concluded that RISD has eliminated the vestiges of its prior *de jure* system in the areas of student transportation, extracurricular activities, and facilities, and the RISD has requested an agreed stipulation.

### III.     RISD HAS ELIMINATED THE VESTIGES OF THE FORMER SEGREGATED SYSTEM

37.     Elimination of the vestiges of the former *de jure* system to the extent practicable is the second prong of the *Dowell – Freeman* unitary status analysis.  In *Green v. County School Board*, the Supreme Court held that a school district achieved unitary status when it is "devoid of racial discrimination with regard to faculty, staff, transportation, extracurricular activities,

facilities, and pupil assignment" – the so-called Green factors.[67]   The Supreme Court identified

six areas that must be addressed as part of the determination of whether a school has fulfilled its

duties and eliminated the vestiges of the prior dual school system to the extent practicable: (1)

student assignment, (2) faculty; (3) staff; (4) transportation; (5) extracurricular activities; and (6)

facilities.[68]   The Supreme Court also approved consideration of other indicia, such as "quality of

education," as an important factor in determining whether a district has fulfilled its desegregation

obligations.[69]   Additionally, in assessing pupil assignment, a critical component, courts should

look to the existence of racially neutral attendance zone lines and majority to minority and

minority to majority transfers.[70]

### A.      Student Assignment

38.      The first of the *Green* factors requires an examination of student assignment

across the District's schools.[71]   The Supreme Court has stated that the "constitutional command

to desegregate schools does not mean that *every* school in every community must always reflect

the racial composition of the school system as a whole."[72]   Thus, a unitary school system does

not require a racial balance in all of the schools.[73]   The school board's constitutional duty is to

cure the continuing effects of the dual school system but it need not achieve an ideal racial

balance in each school.  The district's racial composition is a primary factor in this analysis.

39.      RISD follows a neighborhood school concept, and the primary method for

assigning students to RISD schools is by geographic residence.  If an elementary school becomes

---

[67]      *Green,* 391 U.S. at 435.
[68]      *Id.*
[69]      *Freeman*, 503 U.S. at 492-93.
[70]      *Green*, 391 U.S. at 435.
[71]      *Id.*
[72]      *Flax*, 915 F.2d at 160 (*citing Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 US 1 (1971).
[73]      *Id.; see also Ross v. Houston Indep. School Dist.*, 699 F.2d 218, 227-28 (5th Cir. 1983).

overcrowded,[74] RISD follows an overflow procedure to place the excess students in the next closest campus where space is available.  Also, in accordance with the programs authorized by the Court in its Order signed June 10, 1997, RISD offers school choice in some areas and students also may apply to attend magnet programs in RISD schools located outside their home school attendance area.

### a. Demographic Shifts in Racial Composition

40.     When the District Court originally entered the Desegregation Order in 1970, RISD's racial composition was dramatically different from today.  In affirming the grant of unitary status in *Freeman* for a school district that operated for seventeen years under a desegregation plan, yet still had schools that were 90% Black and 90% White, the Supreme Court observed one salient fact:  "one fact predominates:  remarkable changes in the racial composition of the county presented the [school district] and the District Court with a student population in 1986 far different from the one they set out to integrate in 1969."[75]  In 1969, the school district in *Freeman* was 5.6% Black; in 1986 it had become 47% Black.[76]  Recognizing the significance of this changed demographic data, *Freeman* emphasized that "the demographic changes that occurred *during the course of desegregation are an essential foundation* for the District Court's analysis of the *current racial* mix of [the district]" as it affects the court's determination of the district's unitary status.[77]  To assess the unitariness of the school district, the court was particularly focused on whether the current racial makeup of the schools was a vestige of the former *de jure* system or the result of demographic shifts in population.  The court

---

[74]     The Texas Education Code imposes a student-to-teacher ratio in kindergarten through fourth grades of 22:1.  *See* TEX. EDUC. CODE § 25.112.  Although there is no state-mandated student-to-teacher ratio at fifth and sixth grades, in an effort to maintain reasonable and consistent class sizes, RISD has developed an internal practice that limits the student-to-teacher ratios in fifth and sixth grade classes to 28:1 for overflow and building overcrowding purposes.

[75]     *Freeman*, 503 U.S. at 475.

[76]     *Id.*

[77]     *Id.* at 476 (emphasis added).

resolved that the racial imbalance in these schools was not a vestige of the prior *de jure* system, but a result of the demographic shifts unrelated to the actions of the school district.[78]

41.     In like manner, RISD has undergone a tremendous demographic metamorphosis "during the course of desegregation" between 1970 when the Desegregation Order was entered and today in 2011.   As RISD informed the court in its 1997 motion to modify the student attendance zones, *supra*, the district's purpose was to "address changing demographics" in the district based on the 1996 survey of community needs.  The charts below reflect the demographic shifts over a forty year span that has transformed RISD's student population from a predominantly White school district to a predominantly minority district:

### RISD Student Racial Composition District-wide

| Year | Native American | Black | Asian | Hispanic | White | Total Students |
|------|-----------------|-------|-------|----------|-------|----------------|
| 1970 | 49 | 1,000 | 68 | 194 | 28,759 | 30,058[79] |
| 1974 | 52 | 1,069 | 139 | 316 | 32,319 | 33,895[80] |
| 1997 | 100 | 6,661 | 3,022 | 4,825 | 19,355 | 33,953[81] |
| 2007 | 137 | 8,685 | 2,667 | 10,571 | 11,696 | 33,766[82] |
| 2010 | 111 | 8,095 | 2,369 | 12,979 | 10,329 | 34,701[83] |

42.     Although the size of the total student population has remained relatively stable, the racial mix of the student population has not.  The Annual Reports chronicle that RISD was 96% White in the year of desegregation in 1970, but only 30% White in 2010.  Similarly, RISD was 3% Black in 1970, but 23-26% by 2007 - 2010.  The greatest transformation of RISD's

---

[78]     *Id.* at 478.
[79]     1970 Annual Report to the Court.
[80]     1974 Annual Report to the Court.
[81]     1997 Annual Report to the Court.
[82]     2007 Annual Report to the Court.
[83]     2010 Annual Report to the Court.

student population has been the increased migration of Hispanic students.  In 1970, RISD had less than 1% Hispanic students; in 2010 that number has grown exponentially to 37%.

43.     In 1970, RISD's students were 96% White, 3% Black, and less than 1% Hispanic or other ethnic groups.  By 2010, the District's students had become a rather balanced group of 30% White, 23% Black, 37% Hispanic, 7% Asian and less than 1% Native American.

44.     The sheer numbers tell the story.  In 1970, RISD had 184 Hispanic students, in 2010 it has close to 13,000.  Black students experienced a similar dramatic increase; in 1970 there were 1,000 Black students; in 2010 there are 8,095.  In contrast Whites accounted for 32,319 students in 1974, but in 2010 that number decreased to 10,329.

45.     In the context of determining whether to grant unitary status to a school district, especially one that has been operating under a desegregation order that has lasted decades, numerous federal courts have had to confront and contend with the dramatic demographic shifts in the racial makeup of the district's student population, in order to make a finding whether the current student assignments are a vestige of the former *de jure* system.[84]  In each instance, the inquiry by the courts has been the same:  "when the imbalance is attributable neither to the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces . . . the school district is under no duty to remedy imbalance that is caused by demographic factors."[85]

46.     One thing to be said about the cause of the demographic shifts in RISD's student population is that it is <u>not</u> the vestige of the prior *de jure* system nor due to any new *de jure* violation by the District.  As amply catalogued in the foregoing section of this brief, and as supported by the history of RISD's compliance with the Desegregation Order in this case, and

---

[84]     *Freeman*, 503 U.S. at 476-477, *Flax*, 915 F.2d at 161; *Ross*, 699 F.2d at 220.
[85]     *Freeman*, 503 U.S. at 493-494, *Spangler*, 427 U.S. at 436.

since 1979, the Court's own docket is free of any orders that RISD has violated the Desegregation Order.[86]

47.     Turning to the question of "independent demographic forces," this Court in 1997 was presented with that information in connection with RISD's request to modify the student assignment plan.  In the June 10, 1997 order approving the current student assignment plan, the court made no finding that RISD was responsible for or had caused the demographic shifts in student population back then.  RISD's motion, filed April 15, 1997 and the study that supported that motion, discussed the District's "changing demographics" and the need to address those changes with a modified student assignment plan and added new facilities.  A comparison of the 1970 with the 1997 student data, set forth above, shows that the demographic shift in RISD's student population was already underway.  In 1997, RISD's Hispanic student population had grown from 194 to 4,825 students, the number of Black students went from 1,000 to 6,661 and the White student population dropped from 28,759 to 19,355.  The Court considered this data when it approved the student assignment plan in 1997 and did not find fault with RISD.  As the Court noted in its June 10, 1997, order, "the Plaintiff herein, the United States of America" approved that plan.  A further comparison of the 1997 data with 2007 and 2010 data demonstrates that the same trend in the racial demographic shifts has continued for the past fourteen years.  There is no evidence that RISD caused this shift.  Indeed, RISD had nothing to do with it.  The shift is due to changing residential housing patterns and the "normal pattern of human migration."[87]  *See* **Exhibit A**, Demographic Analysis, dated January 2011, App. 000001.

48.     In a 2006 opinion, the Fifth Circuit took notice of the increased Hispanic student population "throughout Texas" in reversing a lower court decision that dealt with the alleged

---

[86]     In *Freeman* the Court observed that "a history of good faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation."  *Freeman*, 503 U.S. at 498.

[87]     *Pasadena Board of Education*, 422 U.S. at 436.

segregative effects of inter-district student transfers between two school districts that were operating under a desegregation order.[88]   In *Hearne,* the Fifth Circuit observed that "the racial composition of public schools in Texas has changed drastically"[89] and noted especially that "Hispanics [were] the racial group that has grown considerably in both Hearne and Mumford *(just as it has grown all over Texas")*.[90]

49.   The student population shifts in RISD comport with the court's analysis in *Freeman* and *Hearne*.   As the Supreme Court observed in *Freeman,* where the "demographic shifts have had an immense effect on the racial composition . . . of the schools," thus rendering that district majority Black "during the course of desegregation," and where the "remarkable changes in the racial composition of the county presented the District Court with a student population . . . far different from the one they set out to integrate," but where "the rapid populations shifts . . . were not caused by any action on the part of the [district] . . . and there was no evidence that the school system's previous unconstitutional conduct may have contributed to this segregation," the school district had achieved unitary status with respect to student assignment.[91]   Key to the court's determination of unitary status was its analysis that "as the *de jure* violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system."[92]

50.   *Freeman* also took favorable notice of the fact that despite the demographic shifts, the school district had nevertheless undertaken steps to combat those effects by implementing a

---

[88]    *United States v. Texas Education Agency*, 457 F.3d 472 (5th Cir. 2006) (involving Hearne ISD).
[89]    *Id.* at 475.
[90]    *Id.* at 477 (emphasis added).
[91]    *Freeman*, 503 U.S. at 475-480.
[92]    *Id.* at 496.

bi-racial committee, majority to minority transfers and a magnet school program.[93]   The court's

focus was on the district's policy to combat demographic shifts.

51.      In every respect, RISD efforts fit squarely with the court's analysis in *Freeman*.

The *de jure* violation found in 1970 is remote in time and the intervening demographic shifts in

student population are the result of private,[94] not state action.[95]   Rather, they are attributable to

the "normal pattern of human migration,"[96] due in part to the "drastic" increase in the Hispanic

student population noted in *Hearne*, coupled with the equally dramatic decrease in the White

student population and increase in the Black student population.   In this regard, RISD is unique –

it has evolved into a tri-ethnic school system unlike *Freeman* and more like *Hearne*.   The

evolution is not a vestige of the former *de jure* system.   Moreover, as a matter of district policy,

RISD has successfully implemented each of the steps cited in *Freeman* to combat the effects of

those demographic shifts.   It has adopted a majority to minority student transfer policy, has a Bi-

Racial Advisory Committee it regularly consults as it did in 1997,[97] and has a robust magnet

school program.   Under these circumstances, RISD has demonstrated it has achieved unitary

status in student assignments.

    b. *Racially Identifiable Schools*

52.      As part of its analysis of student assignment as a *Green* factor, courts look to the

number of racially identifiable schools.   The racial demographic shift in the RISD's student

---

[93] *Freeman*, 503 U.S. at 479.

[94] The Fifth Circuit affirmed that Fort Worth ISD was not required to counter the effects of "white flight" to the desegregation plan. *Flax*, 915 F.2d at 162.

[95] *Pasadena Bd. of Education v. Spangler*, 427 U.S. at 436 (affirming unitary status in student assignment where the changes in the racial makeup were caused by demographic shifts "not attributed to any segregative acts on the part of the school district.")

[96] *Id.*

[97] Docket Sheet at 10 (the Bi-racial Advisory Committee approved the student attendance plan that was approved by the Court in 1997).   Moreover, as the record in support of this motion reflects, RISD has consulted with the Bi-racial Advisory Committee for input in moving forward with unitary status.

population has resulted in a <u>less</u> segregated school district and with demonstrably fewer racially

identifiable schools:

### Racially Identifiable Schools[98]

|  | **1970** | **1974** | **1997** | **2007** | **2010** |
|---|---|---|---|---|---|
| High Schools | 4 of 4 | 4 of 4 | 1 of 4 | 0 of 4 | 0 of 4 |
| Junior High Schools | 6 of 6 | 7 of 7 | 2 of 9 | 0 of 9 | 0 of 9[99] |
| Elementary Schools | 24 of 24 | 28 of 28 | 7 of 39 | 8 of 41 | 6 of 41 |

53.       As the foregoing chart reflects, RISD has made tremendous strides in achieving

racial balance among its schools.

54.       Applying an 80% ratio[100] to determine if any schools are racially identifiable

today, out of the 55 schools that exist in 2010, none of the RISD four high schools are one-race

or predominantly of one-race, as are none of the nine RISD junior high schools.  This trend

towards racial balance has remained pretty constant for the past fourteen years at the secondary

level since 1997 when the Court approved the current student assignment plan.

55.       At the elementary school level, this same trend has continued.  In 1970, all 24

elementary schools were between 93% to 99% White, whereas in 2010, only six of 41

elementary schools are racially identifiable applying the 80% ratio in *Flax v. Potts*, *supra*.

---

[98]       The source of this data is from the Annual Reports filed with the court in 1970, 1974, 1997, 2007 and 2010.
Herein, we have applied an 80% ratio to determine if a school is deemed racially identifiable of one race.  *See Flax*,
915 F.2d at 161.

[99]       Includes Freshman Center.

[100]      In determining whether Fort Worth ISD was entitled to a finding of unitary status, the Fifth Circuit applied
an 80% ratio to determine if any schools were racially identifiable, and if so, whether this was due to a vestige of the
former *de jure* system.  *Flax*, 915 F.2d at 161, and 161, n.8 (noting that the Fifth Circuit has applied up to a 90%
ratio) (citations omitted).

Applying a 90% ratio,[101] only two of the 41 RISD elementary schools are racially identifiable (Hispanic).

56.     A further analysis of the six elementary schools[102] that appear to be racially identifiable at an 80% or more ratio demonstrates that the racial makeup is more attributed to the "normal pattern of human migration" and demographic student population shifts discussed above.  For instance, Mohawk Elementary was 99% White in 1970 but is today 80% White with a racial mix of Hispanic, Black and Asian students.  In 1970 Mohawk was and remains today in the J.J. Peace High School feeder attendance zone.  Pearce and Mohawk are located across the street from each other in a predominantly White neighborhood in the City of Richardson.  Therefore, it cannot be said that RISD has taken any steps to redraw the feeder attendance zones of Mohawk to relocate it in a predominantly White neighborhood.

57.     Of the five elementary schools that are 80% Hispanic, all five are located in the Richardson High School ("RHS") feeder attendance zone.  The area of Richardson in which these campuses are located has become, overtime, a Hispanic neighborhood.  In 2010, RHS had the highest Hispanic student population at 37% of the four high schools, but is overall a racially balanced school.[103]  Of the five elementary schools, three of them (Dover, J. Frank Dobie and Spring Valley) have been located in the same spot since 1970 and were in 1970 in the RHS feeder attendance zone.  RISD has not undertaken any efforts to relocate these three elementary schools into a "Hispanic" feeder attendance zone.  Moreover, in 1970, Dover was 97% White and J. Frank Dobie and Spring Valley were 98% White.  Today, Dover is 6% White, J. Frank

---

[101]     *See Davis v. East Baton Rouge Parish School Bd.,* 721 F.2d 1425, 1431 (5th Cir. 1983); *Singleton v. Jackson Mun. Separate School Dist.,* 541 F.Supp. 904, 910 (S.D. Miss. 1981) (both applying a 90% ratio).

[102]     The six elementary schools are Mohawk Elementary (80% White); Carolyn G. Bukhair Elementary (93% Hispanic); Dover Elementary (88% Hispanic); J. Frank Dobie Primary (91% Hispanic); Spring Valley Elementary (86% Hispanic); and RISD Academy (83% Hispanic).

[103]     In 1970 RHS was 95% White.  In 2010, RHS was 37% Hispanic, 33% White, 19% Black and 7% Asian.

Dobie is 1% White and Spring Valley is 5% White.  Compared to 1970, the current White racial makeup of these three schools can hardly be said to be a vestige of the former *de jure* system.  Given the recent demographic phenomenon of increased Hispanic migration into the District, the current Hispanic makeup of these schools cannot be said to be a vestige of the system that existed in 1970.[104]

58.      Carolyn G. Bukhair Elementary is a new addition to the District, built in 2004 as part of the bond program passed in 1996 and included in the 1997 student assignment plan submitted by the District and approved by the Court.  As a new addition, Bukhair cannot be said to be a vestige of the former system.  In light of the Court's approval of the 1997 student assignment plan, which included Bukhair, RISD's site location of the campus cannot be said to create a new *de jure* violation.[105]  The location of Bukhair was designed to alleviate overcrowding as identified in the District's 1996 study and had nothing to do with race.

59.      The desegregation results of RISD compare more than favorably with the unitary status affirmed by the Fifth Circuit in *Flax v. Potts* and *Ross v. Houston Independent School District,* despite the existence of many schools that were 80% racially identifiable schools after more than 16 and 25 years, respectively, of operating under a desegregation order.  In *Flax*, 14 of Fort Worth ISD's ("WFISD") 98 schools still were 80% Black.[106]  In *Ross*, 22 of the 226 schools in Houston ISD ("HISD") were deemed racially identifiable in 1956, the year of desegregation.  In 1983 when HISD sought unitary status, 55 of the district's 226 schools were deemed 80%

---

[104]      The constitutional command to desegregate schools does not mean that every school must reflect the racial composition of the school system as a whole.  *Flax*, 915 F.2d at 160.  The existence of a few racially homogeneous schools within a school system is not per se offensive to the Constitution.  *Montielh*, 848 F.2d at 633.
[105]      *Freeman*, 503 U.S. at 498.  Good faith compliance with a desegregation order is evidence that any current racial imbalance is not the product of a new *de jure* violation.
[106]      *Flax*, 915 F.2d at 161.

racially identifiable.[107]  Despite the seeming step backward, the district courts credited the efforts of the school districts to comply with the desegregation orders and eliminate the vestiges of the former *de jure* system to the extent practicable.  The Fifth Circuit affirmed the unitary status of Fort Worth and Houston in *Flax* and *Ross*, respectively, attributing the remaining racially identifiable schools to demographic population shifts and changes in residential housing patterns, neither of which was the result of any segregative conduct by the school districts.  Once a district has taken all efforts to eliminate the vestiges of the former *de jure* system to the extent practicable, the courts do not require "heroic measures,"[108] "maximum segregation,"[109] "any particular degree of racial balance or mixing,"[110] nor maintaining "racial balance for its own sake."[111]  Under these circumstances, there remain no vestiges of the RISD's former *de jure* system and the District is entitled to a finding of unitary status in student assignment and dissolution of the Desegregation Order.[112]

### B.   Faculty and Staff Assignments

60.     The second and third *Green* factors deal with faculty and staff, requiring that a district not discriminate in its distribution of these employees.[113]  In *Flax*, the court noted that FWISD had maintained faculty and staff assignments at each school, which reflected the racial composition of teachers and principals district-wide.  While six schools did not comply with these ratios, the change in the race of only one or two teachers would restore the ratios.[114]  To achieve unitary status, however, a school district need not employ a faculty and staff having a

---

[107]    *Ross*, 699 F.2d at 226.
[108]    *Freeman*, 503 U.S. at 493.
[109]    *Montielh*, 848 F.2d at 632.
[110]    *Swann*, 402 U.S. at 494.
[111]    *Freeman*, 503 U.S. at 494.
[112]    *Overton*, 834 F.2d at 1177.  (court should abdicate its supervisory role).
[113]    *Green*, 391 U.S. at 435.
[114]    *Flax*, 915 F.2d at 163.

racial composition substantially equivalent to that of its student body in order to effectively desegregate its schools and attain unitary status.[115]  "Fierce competition" (among other factors) for a diminishing pool of minority teachers may prevent school districts from employing faculty and staff having a similar racial composition to the student population. [116]  Therefore, a school district must simply show good faith efforts to eliminate the vestiges of discrimination in the manner in which it assigns faculty and staff.[117]

61.     Here, RISD has made extensive efforts to eliminate the vestiges of past discrimination in the manner in which it assigns faculty and staff.  RISD, for example, strives to have a diverse and balanced teaching faculty in its schools and is committed to recruiting, hiring, and retaining a highly qualified staff on a non-discriminatory basis.  The District traditionally has been a very attractive employer in the Metroplex.  In recent years, however, RISD, like all area school districts, is competing in a shrinking applicant pool.[118]  RISD competes with the many school districts in the Metroplex area for a dwindling supply of qualified educators, but also with other public and private businesses.  There is particularly strong competition between area school districts for qualified teachers in critical needs areas such as bilingual, math, science, and special education.  To help RISD remain competitive, particularly for teachers in these critical needs areas, the Board approved critical needs stipends for teachers in these subject areas.  Also, as the inventory of affordable housing in Richardson diminished, newly graduated educators and qualified administrators who wish to work in RISD often rent or purchase housing in suburbs to

---

[115]     *Fort Bend Ind. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1137 - 38 (5th Cir. 1981) (stating "[i]n no instance is the percentage of minority personnel so high or so low that the school is identifiable as a minority or black school . . .  Thus . . . the slightly uneven distribution of certified personnel does not preclude unitary status in the areas of faculty and staff").

[116]     *Flax*, 915 F.2d. at 163.

[117]     *Fort Bend Ind. Sch. Dist.*, 651 F.2d at 1137.

[118]     *Flax*, 915 F.2d at 163. (N. D. Tex. stated that because FWISD set "arduous goals" for itself but "fierce competition" for diminishing pool of minority teachers made achieving its goal extremely difficult, FWISD made extensive efforts to eliminate the vestiges of discrimination in the manner in which it assigned its faculty and staff).

the north of RISD such as Allen, McKinney, and Frisco.  As those teachers begin their families, they sometimes leave RISD to work closer to home and to their children's schools or day care to eliminate the substantial commute.  To help combat the shrinking supply of qualified educators, several years ago the Texas Education Agency approved an alternate certification process through which persons who do not graduate with a traditional education degree could earn a Texas teaching certificate by participating in a targeted training program that involves classroom instruction and on the job training.  RISD participates in several of these alternative certification programs and hires applicants who are certified through these programs.

62.     The recruitment and hiring efforts of the District have been successful in increasing the representation of minority teachers.  RISD has a policy of nondiscrimination in recruitment and hiring.   As with nearly every Texas school district, White teachers and administrators are somewhat over-represented while minority teachers and administrators are under-represented.  Nevertheless, RISD has shown an increase in the number and percentage of minority teachers between 1974 to 2010 as follows:

### RISD Teacher Assignments[119]

|                     | 1974 | 1997 | 2007 | 2010 |
|---------------------|------|------|------|------|
| **White**           | 1464 | 2079 | 2054 | 2033 |
| **Hispanic**        | 3    | 31   | 157  | 224  |
| **Black**           | 35   | 69   | 180  | 209  |
| **Native American** | 1    | 9    | 10   | 7    |
| **Asian**           |      | 6    | 0    | 36   |

63.     Between 2007 and 2010, RISD increased the total number of its teachers by 117 (2,440 to 2,557).   During this same timeframe, RISD increased the absolute number and

---

[119]      The source of this data is from the Annual Reports filed with the court in 1974, 1997, 2007, and 2010.

percentages of minority faculty for all races compared to the number that existed in 1974 as a result of its non-discriminatory employment practices, the alternative certification program, and other incentive programs to attract qualified teachers.  RISD has not had a decline in the number or percentage of minority faculty during the forty-one year process of desegregation.  In fact, from 2007 to 2010, RISD has increased the number of Hispanic teachers from 154 to 229 and Black teachers from 145 to 209 – a 69% total increase for both groups.

64.     RISD has made good faith efforts to recruit minority faculty and staff so as to remedy the effects of any past discriminatory practices.[120]  And RISD's good faith efforts in recruitment have, for example, strongly contributed to the increase of minority faculty and staff in RISD.  RISD's Human Resources Department is responsible for recruiting qualified applicants to meet the District's hiring needs.  The District has two main recruiting periods each school year – Fall Recruiting Schedule and Spring Recruiting Schedule.  The longer is the Spring recruiting period during which RISD recruits applicants for vacancies for the coming school year.  The Spring recruiting period generally runs from February to May.  The shorter recruiting period occurs during the Fall in October and November when RISD recruits for anticipated mid-year vacancies.  In addition to the targeted recruiting periods, RISD always seeks qualified applicants to fill critical areas and maintains an applicant pool to fill the necessary positions.

65.     During the recruiting periods, RISD travels to colleges and universities, including 11 historically Black colleges and other predominantly minority institutions, to interview expected graduates who will earn a degree in education.  RISD participates in area job fairs, holds its own job fair, and participates in targeted job fairs and expos designed to target particular applicant pools such as bilingual and minority teachers.  To help ensure that qualified minority applicants know of the employment opportunities available in RISD, Human Resources

---

[120]     *See United States v. Texas Education Agency*, 467 F.2d 848 (5th Cir. 1972).

recruiters consistently participate in recruiting fairs at schools that are set up to attract a large number of minority applicants.  Further, depending on the type of position available to qualified applicants, RISD posts available positions via: (1) internet, (2) Region 10 Education Service Center Employment web site, (3) Texas Association of School Administrators job posting site, (4) other trade publications, (5) local newspapers and minority publications such as *Al Dia*, the convention catalogs for the National Association of Black School Educators' convention, the Big 12 Conference on Black Student Government, *Post Tribune*, *North Dallas Gazette*, and (6) radio.

66.     RISD strives to offer a variety of opportunities, formal and informal, through which employees may develop and demonstrate leadership skills that will assist them in progressing in the District.  The District operates a Leadership Development Academy ("LDA") in which teachers who aspire to be administrators may apply.  Participants receive training and hands-on work experience to help them gain experience and skills needed to prepare them for an administrative role.  Persons who apply for the LDA program generally are already working toward their Master's Degree and Administrator's Certificate.  RISD also participates in a program through which participants can earn their Master's Degree and RISD pays the costs in exchange for the individual's agreement to continue to work for the District for a particular period.  This program targets qualified minority applicants who wish to become administrators. The participants are assigned in an assistant principal role while completing the education program.

67.     RISD partners with Lamar University in Beaumont, Texas, to offer an affordable online Master's degree program to interested educators.  To further support its educators, RISD pays the program costs up front, and the educator pays back the fees via payroll deduction.

68.     RISD's diversity is strong overall because of the District's strong commitment to equal opportunity and nondiscrimination and its good faith efforts and procedures designed to balance student's needs with the availability of qualified teachers and staff.   RISD has successfully eliminated vestiges of discrimination in recruitment, hiring, and assignment of faculty and staff to the extent practicable.   As with student assignments, teachers and staff are distributed across all of the District's schools.   Teachers are not assigned to schools based on their own race or the racial make-up of the campus, nor is there any correlation between a school's racial/ethnic distribution of its teaching and administrative staff.[121]   Nevertheless, in order to compete in a shrinking labor pool, RISD has tried to aggressively recruit with critical needs stipends, alternative certification programs, and other innovative recruitment efforts.   In the forty-one years of desegregation, based on the Docket Sheet, there is no record that the Plaintiff has objected to the District's hiring practices, nor has the Court found the District in violation of the Desegregation Order with respect to the *Green* factor of faculty and staff assignments.

### C.     <u>Transportation</u>

69.     The fourth *Green* factor is transportation.[122]   RISD provides appropriate transportation according to Texas Education Agency guidelines without regard to the race or ethnicity of the child in accordance with state and federal law.   Currently, RISD provides bus transportation for 5,483 regular education students and 533 special education students.   RISD contracts with Dallas County Schools for all transportation services on a nondiscriminatory basis.   Specifically, Dallas County Schools provides free bus transportation for (i) students who attend magnet schools, (ii) students who live more than two miles from their schools, (iii)

---

[121]     There has never been a *Singleton* application to RISD.
[122]     *Green*, 391 U.S. at 435.

students who may live less than two miles from school, but must travel a hazardous route to reach school, and (iv) disabled students who require transportation as a related service to attend school.  RISD also provides free transportation to students who attend after school tutoring or enrichment programs, and Saturday school.   If RISD must reassign a student to a school other than his/her home school due to overcrowding, RISD must provide transportation to and from the new school.  Moreover, students who obtain majority-to-minority transfers are entitled to bus transportation.  RISD maintains a small fleet of buses is maintained by RISD for other daily transportation needs such as field trips and other special events when Dallas County Schools cannot schedule transportation.

70.     All transportation services are operated on a non-segregated basis.  Therefore, all RISD students eligible for bus transportation services regardless of race have access to school transportation.  As such, RISD has demonstrated that its transportation policies and application thereof are racially neutral and in compliance with the Court Order and state and federal law.  In the forty-one years of desegregation, the Plaintiff has never objected to the transportation service provided by the District, nor has the Court found the District in violation of the Desegregation Order with respect to this *Green* factor.

71.     The DOJ has conceded that the Distinct is in compliance with this *Green* factor and RISD has requested an agreed stipulation.

**D.     Extracurricular Activities**

72.     The fifth *Green* factor evaluates a District's policies and procedures in place for student participation in extracurricular activities.[123]  RISD attempts to offer a wide variety of extracurricular activities, including academic activities, clubs, and athletic activities at the middle school and high school levels designed to appeal to its diverse student body.   Student

---

[123]     *Green*, 391 U.S. at 435.

participation in extracurricular activities sponsored by RISD is a privilege and conditioned on compliance with District policies and procedures.  RISD's policies and procedures apply to all students without regard to race as RISD maintains a strict policy of nondiscrimination and equal opportunity.  There are no discriminatory practices, policies, or procedures in relation to student participation in any extracurricular activities.

73.     Race-based selection criteria are not employed in any extracurricular activities. RISD currently offers extracurricular activities, including academic activities, clubs and athletic activities at the middle school and high school levels.

74.     Participation in some of those extracurricular programs is, to some degree, based on skill and ability.  For example, while anyone can try out for any one of the various athletic teams, for a player to make the team, he or she must have an athletic ability.  Similarly, the academic honor societies require that students meet certain academic requirements that are set by each honor society and/or the District.  Thus, certain RISD extracurricular activities require students to meet certain requirements, but again, race is not a factor at all.

75.     There are also extracurricular activities wherein the members are elected by a popular vote of the student body.  For instance, class officers for each school are elected by their peers.  Students can run for office upon meeting race neutral criteria set out by the District. Similarly, awards such as class favorite, homecoming court, etc. are determined by student vote.

76.     Every student has the same opportunity to participate in extracurricular activities, and, as demonstrated, there is no evidence of discrimination in any of RISD's extracurricular activities that would demonstrate that any vestige of *de jure* segregation remains in RISD, or that

RISD has implemented a policy or procedure that would suggest that all vestiges of *de jure* discrimination have not been eliminated to the extent practicable.[124]

77.     In the forty-one years of desegregation, there has never been any objection by the Plaintiff to the District's programs of extracurricular activities, nor any allegation of racial discrimination, nor has the Court found RISD in violation of the Desegregation Order in this *Green* factor.

78.     The DOJ has conceded that the Distinct is in compliance with this *Green* factor and RISD has requested an agreed stipulation.

### E.     Facilities and New School Construction

79.     The final *Green* factor deals with the evaluation of a district's facilities.[125]   The court in *Flax* rejected the claim that new school construction in Black neighborhoods resulted in more one-race schools because (1) the motion to construct new schools was unopposed by the plaintiff and (2) the court had approved a Facilities Improvement Program, which fully complied with duty to maintain a school system free of segregation.[126]

80.     All of RISD's instructional and auxiliary facilities have been either constructed or renovated in a race neutral manner and on an as needed basis in order to maintain the useful life of the structure without regard to the race or ethnicity of the students attending each facility. Further, it is important to note that all new construction and renovation in RISD for the past forty-one years was built while operating under the Desegregation Order and with the oversight and support of its Bi-Racial Advisory Committee.   Site selection of new construction was approved to prevent a dual school structure.  For example, the data from a 1996 survey was used

---

[124]     *Jenkins*, 515 U.S. at 87-89; *Freeman*, 503 U.S. at 491-92, 498; *Dowell*, 498 U.S. at 248-50.
[125]     *Green*, 391 U.S. at 435.  Although the DOJ has determined that RISD is unitary in this area and has complied with this *Green* factor, RISD will nevertheless address it for the Court.
[126]     *Flax*, 915 F.2d at 163.

by RISD to construct two new schools.  In 1996 the District passed a bond package for new school construction and a new student assignment plan.  The RISD appointed a panel to develop data for locations of the two schools which focused on the growth of single family residences and multi-family residences and visited with land developers and builders to determine where to build these two schools based on the data collected.  One of the schools, Christa McAuliffe Learning Center, was built to serve students in kindergarten through 12th grade who required assignment to a disciplinary alternative learning center for behavioral reasons.  Prior to building this school, RISD anticipated number and race of students to be served would be:

| Total | Native American | Black | Asian | Hispanic | Other |
|-------|-----------------|-------|-------|----------|-------|
| 400 | 0 | 175 | 13 | 79 | 133 |

81.    RISD built another school, now called the Lake Highlands Freshman Center, to serve students in the ninth grade from the Forest Meadow and Lake Highlands Junior High attendance areas because population growth in the surrounding areas had created overcrowding in those two junior high schools.  Prior to building this school, the RISD anticipated number and race of students to be served would be:

| Total | Native American | Black | Asian | Hispanic | Other |
|-------|-----------------|-------|-------|----------|-------|
| 815 | 2 | 256 | 33 | 86 | 439 |

82.    In 1997 the Court entered an order approving the new student assignment plan and the construction of new schools.[127]  Both Christa McAuliffe and Lake Highlands Freshman Center were built in compliance with the Court's 1997 order.  The District filed Annual Reports detailing the progress in constructing these schools.  No objection was ever filed by Plaintiff.

---

[127]    Docket Sheet at 10, June 10, 1997 Order.

83.     For the past fourteen years, the RISD has filed Annual Reports with the Court reporting that all facilities, schools, gymnasiums, libraries, cafeterias, and auditoriums are operated on a desegregated basis.  In each report since 1997 the District provided a listing of all the building constructions, additions, or renovations for that year.  These reports listed the type of renovation involved, *e.g.* library renovation, and provided a report on the schedule for the work to be done.  A review of these Annual Reports shows that the renovations and upkeep of the District's facilities was carried out district wide at all grade levels, depending on the specific needs of each campus.  Moreover, the RISD has reported annually since 1997 any dispositions of school district property, including the type of property and the dollar value received.  In 2002 the RISD reported on its efforts to construct two new elementary schools to alleviate overcrowding, and reported the selection of the site for each school had been made with input from the Bi-Racial Advisory Committee.  In 2005 RISD reported that it was conducting a review of facilities in order to repurpose certain facilities to effectively manage costs and obtain the best use.  The 2005 Annual Report identified the facilities to be repurposed and the relocation of certain magnet programs.  In 2005 the District reported the opening of two elementary schools, Carolyn Burkhair and Thurgood Marshall, and reported on the need to reassign students to certain facilities due to the "ongoing shifts in the population of RISD."  In 2006 RISD updated the Court on its repurposing project and identified the schools affected, and the $2.3 million received for the sale of one facility.  In 2008 and 2009 RISD reported on building renovation and indicated no new construction for those years.

84.     The District's 2009 Annual Report reflects a list of the present or proposed projects for the construction or expansion of facilities.  RISD currently has no plans for new school construction or additions within the next five years.

85.     In the past fourteen years, no objection has been filed by the Plaintiff with the Court regarding RISD's new construction or renovations and additions to existing facilities. Similarly, the Court has not once rejected any of the facilities renovation or construction projects reported by the District.  A complete review of the forty-one year history in this case shows that no complaint has ever been filed nor any order entered to enjoin the construction of new schools, and no complaint has ever been filed alleging that RISD's facilities program was causing re-segregation.

86.     RISD believes it has complied with this *Green* factor and is entitled to a finding of unitary status accordingly.  Further, the DOJ has conceded that the District is in compliance with this *Green* factor, and the RISD has requested an agreed stipulation.

### F.     Quality of Education

87.     In *Freeman,* the district court considered the "ineffable category" of quality of education as an additional factor.[128]  This component focused on whether there was a racial disparity in the provision of resources and whether minority students were not being given equal educational opportunity.

88.     Any discussion of the quality of education in RISD must begin with a review of the impressive academic achievement of it students.  The District's commitment to serving all students is demonstrated through the strong academic performance of all RISD's students. The State of Texas requires that public school students take the TAKS test.  The State uses the results of this test to create a uniform academic performance rating system for public schools statewide, elementary to high school.  The ratings under the TAKS system are Exemplary, Recognized, Academically Acceptable, and Academically Unacceptable.  RISD has earned the distinction as a Recognized District each year since the 2006 – 2007 school year.  RISD is one of the largest,

---

[128]     *Freeman*, 503 U.S. at 482-483

most diverse districts, if not the largest and most diverse district, in Texas to achieve that distinction.   In the 2009 – 2010 school year, *all* RISD schools were rated Exemplary or Recognized:   37 schools were rated Exemplary; 16 were rated Recognized.   RISD student academic performance in the 2009 – 2010 school year earned the state's highest distinction – an Exemplary rating.   Exemplary performance requires at least 90% of the district's students tested to pass the TAKS test.   Students in grades 3 through 11 are tested in various content areas.   In addition to the academic performance component of TAKS, a district must demonstrate that its students actually complete high school.   RISD met the standard for a Recognized rating in student completion, missing the Exemplary standard by more than twenty students.   Thus, for the 2009 – 2010 school year, RISD was rated overall as Recognized and each of its campuses was rated either Exemplary or Recognized.   Although passing TAKS is an important goal, RISD is not satisfied with students merely passing the test.   The District stresses the importance of students also attaining commended status on the tests, which reflects mastery of the objectives at a much higher rate than required for passing. The following chart shows the achievement of RISD students who passed the TAKS test and achieved commended status over the last two years:[129]

---

[129]     Source: The Texas Education Agency's Academic Excellence Indicator System or AEIS Data

|  | **2008 - 2009** | | | **2009 - 2010** | | |
|---|---|---|---|---|---|---|
|  | # Tested | % Passing | % Commended | # Tested | % Passing | % Commended |
| **Read/ELA** | 19,247 | 93 | 40 | 19,240 | 94 | 43 |
| **Math** | 19,146 | 91 | 46 | 19,340 | 93 | 47 |
| **Writing** | 4,01 | 96 | 38 | 4,398 | 97 | 38 |
| **Science** | 7,969 | 89 | 41 | 8,236 | 91 | 43 |
| **Soc. Studies** | 5,900 | 97 | 65 | 6,106 | 98 | 66 |

89.     In addition to its core academic curriculum, RISD offers a variety of programs designed to develop, enrich, and reward the talents of its students, regardless of race.  For example, at the elementary level, the District offers a REACH program that provides special programming for students identified as talented and gifted.  Entry into the REACH program is academically competitive.   In addition to REACH, the district implemented QUEST, an enrichment program that is designed to place second grade students who did not qualify for REACH in a "talent pool" for a year during which they receive enrichment programming to develop additional skills and knowledge that may enable them to qualify for REACH.   The District's data for 2009 shows that REACH and QUEST enroll students of all ethnicities and races.

90.     RISD offers a gifted and talented program to secondary students (Grades 7 – 12) through its Pre-Advanced Placement ("PreAP") and Advanced Placement ("AP") classes.  Texas is a state that formally employs the College Board AP-PreAP tract for secondary students.  These classes are available to any junior high or high school student willing to commit to a more rigorous curriculum.

91.     RISD also operates several magnet schools and Centers of Interest to appeal to a wide range of student interests and talents.  The District offers Centers of Interest at four junior high schools.  These programs differ from magnets in that their area is localized to their

neighborhood and feeder schools.  Each Center offers a different focus.  RISD located these Centers at four junior high schools to achieve a better balance of student diversity between the J.J. Pearce and Richardson High School attendance zones.  J.J. Pearce is the school with the largest White enrollment; Richardson is the school with the largest Hispanic enrollment.  RISD also opened an arts and technology magnet program at Richardson West Junior High School.

92.     The Math/Science/Technology Elementary Magnet, Arapaho Classical Elementary Magnet and Hamilton Park Pacesetter Magnet are designed for grades kindergarten to sixth.  At the high school level, RISD offers an Arts, Law, and Health Science Magnet at Richardson High School, the school with the largest Hispanic population.  Enrollment in these programs is competitive but open to all students.

93.     In addition to these academic programs, RISD provides programs in fashion design, theatre production, radio and television programming, and similar activities.  RISD's Career and Technical Education program, for example, offers secondary school students real world relevancy in several different career clusters.  This program is open to students of all races to gain entry-level employment in a high skill, high-wage job and/or to continue their education. RISD has equipped all of these programs with state-of-the-art school equipment and all programs are taught by teachers with credentials and experience in their respective fields and who are considered highly qualified.

94.     Students who require special programming to meet their needs also may be assigned in a manner other than by home school geographic residence.  A student whose Admission Review and Dismissal Committee[130] has determined that the student's placement is in a centralized special education classroom (*i.e.,* a behavior classroom or a developmental

---

[130]     In Texas, the multi-disciplinary team that determines the appropriate educational placement for a student receiving special education services is referred to as the "ARD Committee."  This team is called the "IEP Team" in many states.

classroom) may not attend his or her home school if that campus does not have the particular class needed.  RISD has placed central classes in at least one campus in a feeder pattern and the student would be assigned to the classroom closest to his/her home school.  Similarly, a student who is an English language learner and requires a bilingual classroom will be assigned to the school closest to his/her home school that offers a bilingual program if the home school does not have one.

95.     As discussed above, the foundation of RISD's student assignment plan is a student's neighborhood residence.   To provide parents choice in school assignment and programmatic offerings, some students attend schools other than their neighborhood school. RISD, by Board policy, does not accept inter-district transfers on a tuition paid basis.  The Board has authorized the District to accept the following inter-district transfers: (1) the child of an RISD employee who does not reside in the District; (2) senior privilege – a senior student who moves from RISD immediately before or during his/her senior year may remain enrolled; (3) change of residence – a student who moves from RISD during the school year may remain enrolled through the end of the semester in which he/she becomes a nonresident; and (4) acquiring residence – a student of a family who has either purchased, leased, or is building a residence in RISD that is not completed but will be completed within 90 days of the requested enrollment date.  A transfer request is not automatically approved.  The District, in evaluating each transfer request, will consider the following: individual needs of students, student's behavior and attendance history, overall effect the transfer will have on the home and receiving school, student's need for special instructional services not provided at the home school, medical condition of the student as described in a letter from the student's medical provider, a family

request to have similar age siblings attend the same school, building capacity, current enrollment, teacher allocations and class size, and other factors relevant to the particular transfer request.

96.     RISD offers an exemplary education program to all its students, regardless of race.  RISD is entitled to a finding of unitary status in this area as well.

### G.     Student Discipline

97.     Discipline is a very complex area for any school district.  While the concept of the discipline of students is not a *Green* factor, it has been analyzed as part of the "quality of education" provided by a school district.[131]  The 1970 Desegregation Order does not specifically address student discipline; however, RISD complies with the Texas Education Agency guidelines and regulations in reporting student discipline data on an annual basis.

98.     RISD has worked hard to ensure that discipline is carried out fairly to all students. There is no prior judicial determination that RISD has discriminated on the basis of race in its student discipline practices during the ongoing desegregation process.

### IV.     CONCLUSION & PRAYER

Based on all of the information presented in this motion and brief, the RISD has complied with the Court's desegregation orders for a reasonable period of time and has eliminated all vestiges of the *de jure* system to the extent practicable.  Additionally, RISD has demonstrated a continued good faith commitment to the principle of racial equality and to those provisions of the federal law and the United States Constitution that were the predicate for the original judicial intervention forty one years ago.  RISD, through the documentation and conclusive evidence to be presented to the Court, has met the standard to be declared unitary and respectfully requests that this Court set for hearing RISD's motion, and after hearing grant RISD's Motion for

---

[131]     *Tasby v. Estes*, 643 F.2d 1103, 1105 (5th Cir. 1981) ("good order and discipline are essential to good education").

Declaration of Unitary Status, dissolve the Desegregation Order and release the district from further court supervision.

Respectfully submitted,

GODWIN RONQUILLO PC

By:      /s/Marcos G. Ronquillo
MARCOS G. RONQUILLO (*attorney in charge*)
State Bar No. 17226000
JOSE L. GONZALEZ
State Bar No. 08129100
RAMONA SOTO
State Bar No. 24051756
mronquillo@GodwinRonquillo.com
jgonzalez@GodwinRonquillo.com
rsoto@GodwinRonquillo.com

1201 Elm Street, Suite 1700
Dallas, Texas 75270-2084
(214) 939-4400 (Telephone)
(214) 760-7332 (Telecopier)

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on May 6, 2011, this Motion was served on the following counsel electronically via the Court's ECF system:

Mark A. Dann, Esq.
U.S. Department of Justice, Civil Rights Division
Patrick Henry Building
950 Pennsylvania Ave., N.W.
Suite 4300
Washington, D.C. 20530
email:  mark.dann@usdoj.gov

Richard B. Roper, Esq.
U.S. Department of Justice
U.S. Attorney's Office
1100 Commerce St., 3rd Floor
Dallas, Texas  75242

Mia Martin, Esq.
Richardson ISD
400 S. Greenville Ave.
Richardson, Texas  75081
email:  mia.martin@risd.org


/s/Marcos G. Ronquillo
Marcos G. Ronquillo