**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION No. 3:70-cv-04101-O |
| | § | |
| RICHARDSON INDEPENDENT SCHOOL | § | |
| DISTRICT, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
FOR DECLARATION OF UNITARY STATUS AND BRIEF IN SUPPORT**

Pursuant to the Court's June 27, 2011 Order, Plaintiff, United States of America hereby files this response in opposition to the Motion for Declaration of Unitary Status, which was filed by Defendant Richardson Independent School District ("RISD" or "District") on May 6, 2011,[1] and in support of this Response states as follows.

**I.     PROCEDURAL HISTORY**

On September 10, 1970, the Court entered the original Order in this desegregation case.[2] Among other things, the 1970 Order: (1) approved the adoption of certain residential attendance zones; (2) required the District to hire teachers and staff who worked directly with students in a nondiscriminatory manner and assign them so the racial composition of the staff does not further the racial identifiability of the District's schools; (3) directed the District to offer majority-to-minority (M-to-M) transfers; (4) required the District to implement school construction and site selection in a manner that furthered the complete desegregation of the system; (5) allowed the District to grant

---

[1] *See* Order (ECF No. 28) at 2 (Jun. 27, 2011).
[2] *See* Order at 1-10 (Sep. 10, 1970) ("1970 Order"). With respect to the residential attendance zones, the District's Motion conceded that the "Order [] required RISD to continue to operate on the basis of the attendance zone system." Defs' Mot. at ¶ 19.

inter-district transfers in a nondiscriminatory manner, unless such transfers have the cumulative

effect of reducing the desegregation of either the sending or receiving district; (6) prohibited the

District from maintaining any classroom or non-classroom activity on a segregated basis; and (7)

required the District to take appropriate action to prevent any individual from interfering with the

Order.[3]  The 1970 Order also established a Bi-Racial Advisory Committee (BRAC), an indep-

endent advisory body responsible for reviewing the effectiveness of RISD's compliance efforts.[4]

On June 10, 1997, the Court issued an Order Approving Student Assignment Plan, which

approved and authorized the District Long Range Space Needs Recommendation Plan.[5]  This Order

approved RISD's "managed choice" program, which altered the feeder patterns between certain

schools, but stated that all prior orders remained in full force and effect.[6]

On May 6, 2011, RISD filed its Motion for Declaration of Unitary Status and Brief in

Support seeking a declaration of full unitary status and dismissal of the above-captioned case.[7]  On

May 9, 2011, RISD filed an Appendix to its Motion, which contains one document – the only

exhibit District proffered in support of its Motion.[8]  On June 27, 2011, the Court issued two

orders: (1) a Scheduling Order setting a deadline for completing discovery on March 16, 2012;

---

[3] *See* 1970 Order at 1-7.

[4] *See* 1970 Order at 6-7.

[5] *See* Order Approving Student Assignment Plan at 1 (Jun. 10, 1997) ("1997 Order"); RISD's Mot. to Approve Prop. Student Assignment Plan (Apr. 14, 1997) ("1997 Motion"), Exh. B (Long Range Space Needs Recommended Plan) ("1997 Plan").

[6] *See* 1997 Order at 1.

[7] *See* Mot. for Decl. of Unitary Status and Br. in Supp. (ECF No. 18) at 1-47 (May 6, 2011) ("Motion").

[8] *See* Defs' App. in Supp of Mot. for Decl. of Unitary Status (ECF No. 19) at 1-291 (May 9, 2011).  RISD's Motion contains numerous factual assertions with no corresponding citations to the Appendix or other exhibits or documents, and it is unclear based on the United States' review of the pleadings the extent to which the documents contained in the Appendix relate to and/or support the factual contentions made in the Motion.  In fact, contrary to the local rules, the District's Motion contains only one citation to the Appendix, and that reference is limited to the title page of the 291-page document.  *See contra* LR 7.2(e) ("If a party's motion or response is accompanied by an appendix, the party's brief must include citations to each page of the appendix that supports each assertion that the party makes concerning any documentary or nondocumentary evidence on which the party relies to support or oppose the motion.").  Moreover, virtually all of the tables/charts contained in the Appendix contain headings that appear only as dark blocks in both electronic and print format, severely limiting the United States from fully comprehending the underlying data, and the District has not yet provided the United States with an updated, readable version of the document.

and (2) an Order directing Plaintiff to file its response to RISD's Motion by September 1, 2011, more than six months before the close of discovery.[9]

On June 24, 2011, the parties filed their respective proposed scheduling orders, which contained a joint stipulation regarding the issues of student transportation, extracurricular activities, facilities, and special education.[10]  On August 17, 2011, the Court issued an Order for Partial Unitary Status dismissing the desegregation decree with respect to those four areas.[11]

## II.     STANDARD OF PROOF

To prevail on its Motion for Unitary Status, RISD must prove at an evidentiary hearing that the continued racial segregation of its schools is not traceable to the District's *de jure* actions.[12]  Specifically, RISD must show that the District has: (1) fully and satisfactorily complied with the court's desegregation orders for a reasonable period of time; (2) eliminated the vestiges of its past *de jure* discrimination to the extent practicable; and (3) demonstrated a good faith commitment to the whole of the court's order and to the underlying principles of equal protection.[13]

The first prong of this analysis requires RISD to show compliance with the desegregation decree "since it was entered."[14]  In relation to the third prong, the District also must "demonstrate[], to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the courts' decree and to those provisions of the law and the Constitution that were

---

[9] *See* Scheduling Order (ECF No. 29) at 1 (Jun. 27, 2011); Order (ECF No. 28) at 2 (Jun. 27, 2011).
[10] *See* Defs' Prop. Scheduling Order (ECF No. 26) at 9 (Jun. 24, 2011); Pl's Stip. and Prop. Order (ECF No. 27) at 2 (Jun. 24, 2011).
[11] *See* Order for Partial Unitary Status (ECF No. 30) at 2 (Aug. 17, 2011).
[12] *See Freeman v. Pitts*, 503 U.S. 467, 494 (1992).
[13] *See Missouri v. Jenkins*, 515 U.S. 70, 87-89 (1995); *Freeman*, 503 U. S. at 491-92, 498; *Board of Educ. v. Dowell*, 498 U.S. 237, 248-50 (1991).
[14] *Freeman*, 503 U.S. at 492 (quoting *Dowell*, 498 U.S. at 249-50); *see also Jenkins*, 515 U.S. at 89.

the predicate for judicial intervention in the first instance."[15]  Thus, the Court must not only examine the District's past conduct, but also evaluate "specific policies, decisions, and courses of action that extend into the future."[16]  RISD's compliance with previous orders is the test and the "court need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future."[17]  Rather, it must examine the record for admissible evidence of the District's sincere commitment to the principles of equal protection.

In assessing the second prong of the unitary status test, the Court must remember that "[t]he measure of any desegregation plan is its effectiveness,"[18] and a district "ha[s] to do more than abandon its prior discriminatory purpose."[19]  Moreover, RISD had (and has) an affirmative obligation to revise a plan that fails to eliminate the vestiges of a *de jure* system because it has "a continuing duty to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past."[20]  RISD also has an "affirmative duty ... not to take any action that would impede the progress of disestablishing the dual system and its effects."[21]

---

[15] *Jenkins*, 515 U.S. at 89 (quoting *Freeman*, 503 at 491); *see also Dowell*, 498 U.S. at 247 (the court must inquire into whether it is "unlikely that the school board [will] return to its former ways").

[16] *Brown v. Board of Educ.*, 978 F.2d 585,592 (10th Cir. 1992) ("the court must consider the system's efforts to desegregate, as a whole, across time" including both its past conduct and its "specific policies, decisions, and courses of action that extend into the future"), *reh'g denied*, 978 F.2d 585, *cert. denied sub nom*.

[17] *Dowell* 498 U.S. at 249.

[18] *Davis v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 402 U.S. 33, 37 (1971); *see Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 537-38 (1979) ("the measure of the post- *Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system."); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25 (1971) ("a district court's remedial decree is to be judged by its effectiveness"); *Green v. County Sch. Bd.*, 391 U.S. 430, 438 (1968) (holding that a desegregation plan is unacceptable if it fails "to provide meaningful assurance of prompt and effective disestablishment of a dual system").  As noted by one district court:

> At one time the state of the law was that good faith on the part of a school district was sufficient to enable it to go forward with its desegregation plan without interference from the Court.  Now, however, it is quite clear that there must be more than good faith on the part of the Board, although that is still required.  There must be a plan presented which will effectually remove the vestiges of the dual system, and it is an obligation on the Board of each school district to present such a plan to the Court.

*Cowan v. Bolivar Cnty. Bd. of Educ.*, Civil Action No. DC 6531-K at 2 (N.D. Miss. Jul. 9, 1969).

[19] *Brinkman*, 443 U.S. at 538 (citing *Keyes v. School Dist. No. 1*, 413 U.S. 189, 200-01 n. 11 (1973); *Swann*, 402 U.S. at 28)).

[20] *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (school officials "must demonstrate to the district court overseeing their desegregation efforts that current segregation is in no way the result of [their] past segregative

In assessing whether a school district is unitary, the Court must examine "every facet of school operations,"[22] including the policies and practices that relate to the *Green* factors, which include student assignment (both between and within schools) and faculty and staff recruitment and assignment, as well as other factors, such as quality of education and student discipline.[23] The Court must presume that any current racial disparities in these areas are the result of RISD's prior unlawful conduct unless the District proves that the imbalances are not traceable in a proximate way to its former *de jure* system.[24] Indeed, the District bears the burden of proof on each element of the unitary status test because it has an affirmative duty to take "all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system."[25] Moreover, while the ultimate goal of any desegregation case is to desegregate the schools within the district and then return the district to the control of local authorities,[26] RISD may not be released from

---

actions.") (internal quotes omitted)); *see also Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 459 (1979) ("Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment.").

[21] *Brinkman*, 443 U.S. at 537-38.

[22] *Dowell*, 498 U.S. at 250 (quoting *Green*, 391 U.S. at 435); *see also Freeman*, 503 U.S. at 493 ("the *Green* factors need not be a rigid framework").

[23] *See Green*, 391 U.S. at 435; *Freeman*, 503 U.S. at 492; *Tasby v. Woolery*, 869 F.Supp. 454, 459 (N.D.Tex. 1994) (courts must look "to all facets of school operations, with the *Green* factors as a guide"); *see also Swann*, 402 U.S. at 18 ("existing policy and practice with regard to faculty, staff, transportation, extra-curricular activities, and facilities" are "among the most important indicia of a segregated system"); *Johnson v. Jackson Parish Sch. Bd.*, 423 F.2d 1055, 1056 (5th Cir. 1970) ("We think that it was manifestly clear that the decisions of the Supreme Court and this Court required the elimination of not only segregated schools, but also segregated classes within the schools.").

[24] *See Freeman*, 503 U.S. at 494; *see also Manning v. Hillsborough Cnty Sch. Bd.*, 244 F.3d 927, 942 (11th Cir. 2001) (until a district is declared unitary there is "a presumption [] that all racial imbalances in a school district are the result of the *de jure* segregation."); *but see Tasby v. Estes*, 643 F.2d 1103 (5th Cir. 1981) (describing the *prima facie* burden of proof for claims concerning student discipline).

[25] *Freeman*, 503 U.S. at 485, 494; *Anderson v. School Bd. of Madison Cnty.*, 517 F.3d 292, 298 (5th Cir. 2008) ("every reasonable effort must be made to eradicate segregation and its insidious residue, although complete racial balance is not required.") (internal quote omitted); *Hull v. Quitman Cnty. Bd. of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993); *see also United States v. Fordice*, 505 U.S. 717, 739 (1992) (*Brown* and its progeny established that the burden of proof falls on the district to establish it has dismantled its prior *de jure* segregated system); *Brinkman*, 443 U.S. at 526 (a school district that operated a *de jure* system is under a "continuing duty to eradicate the effects of that system"); *Swann*, 402 U.S. at 25 (school authorities are "'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.'") (quoting *Green*, 391 U.S. at 437-38); *United States v. Texas Educ. Agency*, 647 F.2d 504, 508 (5th Cir. 1981) ("The board's continuing affirmative duty to disestablish the dual system is … beyond question.").

[26] *See Freeman*, 503 U.S. at 489; *see* Defs' Mot. at ¶¶ 1, 6.

judicial oversight until it proves that it "has done all that it could to remedy the segregation caused by official action,"[27] and the passage of time, alone, does not satisfy this standard.[28]

The United States contends that RISD's Motion should be denied outright.[29] If, however, the Court does not deny the Motion, it must hold a hearing to determine whether RISD has achieved unitary status before it can terminate its jurisdiction over this case.[30] Plaintiff is entitled to notice of the hearing and an opportunity to show why the Court should continue to retain jurisdiction.[31] In addition, the parties must develop a detailed, comprehensive record of the District's actions and their impact on the racial identifiability of the schools – a record that contains more than bald assertions by the District's attorneys – in order for the Court to conduct a proper assessment of RISD's unitary status.[32] This will require discovery, including expert discovery in light of RISD's claim that demographic changes are responsible for the racial segregation of its schools,[33] and depositions of fact witnesses, including key District staff and

---

[27] *Anderson*, 517 F.3d at 298 (quoting *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991).

[28] *See Dowell v. Board of Educ.*, 8 F.3d 1501, 1516 (10th Cir. 1993); *see also Brown*, 978 F.2d at 590; *but see* Defs' Mot. at ¶¶ 17, 18, 23, 25, 28, 33.

[29] In practice, the right to an evidentiary hearing on unitary status has been extended exclusively to plaintiffs, not defendant school districts. *See, e.g., Texas Educ. Agency*, 647 F.2d at 509 ("the district court could not dismiss the cause without notice to the *plaintiffs* below and a hearing providing the *plaintiffs* an opportunity to show cause why the dismissal should be further delayed" (emphasis added)).

[30] *See Montielh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988); *see also Lee v. Etowah Cnty. Bd. of Educ.*, 963 F.2d 1416, 1422 (11th Cir. 1992); *Pitts v. Freeman*, 755 F.2d 1423, 1426 (11th Cir. 1985); *Youngblood v. Dalzell*, 925 F.2d 954, 962 n.6 (6th Cir. 1991).

[31] *See Pitts*, 755 F.2d at 1426.

[32] *See Freeman*, 503 U.S. at 474 ("Proper resolution of any desegregation case turns on a careful assessment of its facts"); *see also id*. at 490 (discrimination "may emerge in new and subtle forms after the effects of *de jure* desegregation have been eliminated"); *Green*, 391 U.S. at 437 ("*Brown II* was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which would require time and flexibility for a successful resolution."); *Flax v. Potts*, 915 F.2d 155, 161 (5th Cir. 1990) ("In determining whether school officials and courts have attacked the lingering effects of discrimination with all the weapons which their authority entitles them to employ, we recognize that not only is each district unique, but also that conditions in each district largely determine the remedies necessary to eradicate discrimination"); *Brown*, 978 F.2d at 592 ("To expect the lingering effects of legally mandated separation to magically dissolve with as little effort as the [] school district exerted … is to expect too much."); *but see, e.g.,* Defs' Mot. at ¶ 69 (stating without evidence that "students who obtain majority-to-minority transfers are entitled to bus transportation").

[33] *See* Defs' Mot. at ¶¶ 40-51.

administrators and school personnel, as well as the BRAC, which opposes RISD's Motion.[34]
Thus, the United States is not capable of providing a full, comprehensive response to RISD's
Motion because discovery is ongoing, and the United States reserves the right to supplement this
response at the conclusion of discovery, once more facts and evidence become available and are
properly analyzed.[35]   However, the United States asserts that the contentions raised herein and
supporting data already provide a basis for the Court to deny the District's Motion.

## III.   ARGUMENT

RISD has not proven that it fully complied with the Court's orders, that it has a good faith
commitment to the principles of equal protection, or that it has eliminated the vestiges of its past
*de jure* discrimination to the extent practicable with respect to five key indicia of a segregated
system: (1) student assignment between schools; (2) student assignment within schools; (3) faculty
and staff recruitment and assignment; (4) quality of education; and (5) student discipline.

### A.      Student Assignment Between Schools

The District has not complied with the Court's Orders or demonstrated a good faith
commitment to the principles of equal protection, and it has not eliminated the vestiges of its *de jure*
system to the extent practicable in the area of student assignment between schools.

---

[34] *See* RISD Annual Report (ECF No. 14), Exh. E at 1-2 (Apr. 15, 2010) ("BRAC 2008 Ltr.") (the BRAC stating in
a letter to the District that it "remains concerned about several vestiges of past discrimination that are addressed in
the original court order" and finding "four areas where RISD has addressed, but not acceptably mitigated these
vestiges."). The BRAC has repeatedly expressed concerns regarding continued racial disparities in several areas of
RISD's operations, including student assignment and the maintenance of racially identifiable schools, faculty and
staff recruitment and assignment, student discipline, and RISD's Career and Technical Education programs. *See,
e.g.*, *id* at 1-2; RISD Annual Report (ECF No. 9), Exh. E at 1-3, 4-5 (Apr. 15, 2009) ("BRAC 2009 Ltr.").
[35] For the purposes of this Opposition, the United States relies on two principal sources of data: (1) the District's
responses to a 2008 information request from the United States, as well as some supplemental information; and (2)
information contained in the District's annual reports, including the District's April 15, 2010 Annual Report, which
the United States examined carefully. Thus, the data contained in the United States' demonstrative exhibits, *see* Pls'
App. at US 001-038, contain information related to the 2007-08 and 2009-10 school years.

### 1.      Compliance With the Court's Orders and Good Faith Commitment to the Principles of Equal Protection

The District has not complied with the Court's orders and it has not demonstrated a good faith commitment to the principles of equal protection.  Without yet engaging in discovery, the United States is able to point to at least four examples of blatant noncompliance on the part of the District related to the area of student assignment.  First, RISD constructed two new schools and redrew at least six attendance zones without authorization from the Court.[36]  Second, the record suggests RISD did not open a proposed magnet school as contemplated by the Court in 1997, but rather opened it as a residentially zoned school.[37]  Third, each year for several years, RISD has granted hundreds of intra-district student transfers that are not authorized by the Court's order and do not further desegregation of schools.[38]  Fourth, the District has not fully implemented the court-ordered majority-to-minority (M-to-M) transfer program.[39]  The impact of each of these

---

[36] *See infra* 15-16; *but see* 1970 Order at 5 ("All school construction, school consolidation, and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent a dual school structure, and further shall be planned and carried out so as to achieve the objective of promoting the continuing, complete desegregation of the school system.").  As the District is well aware, the proper course of action before constructing a new school and modifying the court-ordered attendance zones is to seek and obtain approval from the Court.  *See e.g.*, Defs' Mot. at ¶ 27.

[37] *See infra* 14-15; *but see* 1997 Motion at 11 (stating that RISD expected to build an elementary magnet school in the Lake Highland for students who resided in Aikin, Richland, Forestridge, and Stults Road attendance zones).

[38] *See infra* 16-25.  The 1970 Order established attendance zones and authorized only two types of transfers: (1) M-to-M transfers; and (2) inter-district transfers that do not have a cumulative effect of reducing desegregation in either the sending or receiving districts.  *See* 1970 Order at 1-2, 5-6.  The 1997 Order authorized RISD's "managed choice" program, which altered the feeder patterns between certain schools, but stated that all prior orders remain in full force and effect, and RISD is supposed to maintain and enforce the neighborhood school concept and corresponding attendance zones at the elementary school level.  *See* 1997 Order at 1.  The Court's 1997 order does not expressly authorize the creation of centralized special education programs or full-day kindergarten programs at certain schools, but RISD's assignment plan anticipated the creation of these programs, and the Unites States believes these two additional exceptions to the attendance zones were authorized by the Court.

[39] *See infra* 23-25.  The 1970 Order in this case expressly orders the creation of an M-to-M transfer program.  *See* 1970 Order at 5 ("The school district shall permit a student attending a school in which his race is in the majority to choose to attend the nearest school where his race is in the minority" and "[a]ll transferring students shall be given transportation" and "the right to transfer shall not be dependent upon space being available.").  Court's routinely require school districts to implement M-to-M transfers programs because they are a practicable and effective means of addressing racial disparities in student assignment while simultaneously allowing parents greater choice in deciding what schools their children attend.  *Cf. Tasby*, 869 F.Supp. at 461-63.

8

instances of noncompliance is discussed below.  RISD's failure to comply with the Court's Orders places the District's commitment to the principles of equal protection in doubt.

Even if the District could show that it had complied with the Court's Orders, mere technical compliance with a prior order is "not sufficient to discharge its desegregation duties,"[40] and meet its burden of proof.[41]  Instead, the District must show that the Court's orders were effective at eliminating the vestiges of the dual system[42] and that RISD took "every reasonable effort [] to eradicate segregation and its insidious residue."[43]  The Fifth Circuit has made it "abundantly clear" through repeated decisions that "a school system is not automatically desegregated when a constitutionally acceptable plan is adopted and implemented."[44]  To the contrary, "[t]he process of desegregation ... is often one of trial and error; if one set of zones proves ineffective, then another must be drawn and, if necessary, another, or some yet different approach be tried."[45]

The District also claims it is entitled to unitary status based, in large part, on its supposed compliance with the Court's orders, and the fact that this case has remained dormant for several years and the United States has not objected to some of the District's actions.[46]  Indeed, RISD asserts repeatedly throughout its Motion that it took the actions outlined above (and below) "free of any objections or dissent from the Plaintiff," in an effort to suggests that such silence on the part of

---

[40] *United States v. West Carroll Parish Sch. Dist.*, 477 F.Supp.2d 759, 763 (W.D.La. 2007) (citing *Ross*, 699 F.2d at 225).

[41] *See West Carroll Parish*, 477 F.Supp.2d at 763; *see also Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 334 (4th Cir. 2001) ("in some desegregation cases simple compliance with the court's orders is not enough for meaningful desegregation to take place").

[42] *See Davis*, 402 U.S. at 37; *Swann*, 402 U.S. at 25.

[43] *Anderson*, 517 F.3d at 298 (quoting *Ross*, 699 F.2d at 225).

[44] *Texas Educ. Agency*, 647 F.2d at 508; *see also Ross*, 699 F.2d at 225; *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1043 (5th Cir. 1986); *Anderson*, 517 F.3d at 298; *Pitts*, 755 F.2d at 1426; *see similar Valley v. Rapides Parish Sch. Bd.*, 646 F.2d 925, 937 (5th Cir. 1981) ("A plan which gives promise of establishing a unitary system cannot foreclose further relief if it does not in fact abolish the evidences of segregation."), *cert. denied*, 455 U.S. 939 (1982).

[45] *Lawrence Cnty*, 799 F.2d at 1047 (quoting *United States v. Hinds Cnty. Sch. Bd.*, 560 F.2d 1188, 1191 (5th Cir. 1977)).

[46] *See e.g.*, Defs' Mot. at ¶¶ 18-36. The District also relies extensively on *Smiley v. Blevins*, 626 F.Supp.2d 659, (S.D.Tex. 2009), a case which is factually distinguishable from the current matter.  *See e.g.*, Defs' Mot. at ¶ 18.  In that case, there were no active private plaintiffs and the United States, acting as *amicus curiae*, took no position on the school district's motion for unitary status.  *Smiley*, 626 F.Supp.2d 665-66.

the United States somehow implies that the District has satisfied its legal obligations.[47]  These assertions do not fulfill RISD's burden of proof, and the District's suggestion implies, by way of analogy, that a convicted criminal who shoplifts a DVD while on parole did not violate the law if s/he was not caught by a police officer.

Finally, despite the District's claims to the contrary, RISD cannot escape its legal obligation based on the passage of time because "[t]he Constitution does not permit the courts to ignore today's reality because it is temporally distant from the initial finding that the school system was operated in violation of the constitutional rights of its students."[48]  Based on RISD's noncompliance with the Court's Orders, including its decisions concerning school construction, school sitings, and attendance zones, as well as student transfers, including decisions concerning M-to-M transfers, RISD failed its obligation "not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system" whenever it implements policies or takes actions that might impact of the segregation of schools.[49]

---

[47] *See* Defs' Mot. at ¶ 18.  The United States' prior decision not to object to certain actions by the District does not constitute a waiver of its right to oppose RISD's current or future conduct.  Nor does it absolve the District of its burden to prove in the pending matter.

[48] *Brown*, 978 F.2d at 590; *see also Dowell*, 8 F.3d at 1516.

[49] *Harris v. Crenshaw Cnty. Bd. of Educ.*, 968 F.2d 1090, 1095 (11th Cir. 1992) ("the duty to desegregate is violated if a school board fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities."); *see Hull*, 1 F.3d at 1459; *see also Swann*, 402 U.S. at 21 ("it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system"); *Anderson v. Canton Mun. Separate Sch. Dist.*, 232 F.3d 450, 453 (5th Cir. 2000) ("We cannot tolerate resegregation of a former dual school system, and the School Board of such a system must demonstrate that the new construction will not tend to promote such a relapse.") (quoting *United States v. Hendry Cnty. Sch. Dist.*, 504 F.2d 550, 554 (5th Cir. 1974)); *United States v. Board of Pub. Instruc. of Polk Cnty.*, 395 F. 2d 66, 69 (5th Cir. 1968) ("There is an affirmative duty, overriding all other considerations with respect to the locating of new schools, except where inconsistent with 'proper operation of the school system as a whole' to seek means to eradicate the vestiges of the dual system. It is necessary to give consideration to the race of the students."). Ultimately, if a school district cannot be relied upon to submit an acceptable desegregation plan and eliminating zone-jumping transfers does not suffice to meet the district's desegregation objectives, a district court is required to implement additional remedial change to the existing orders.  *See Lawrence Cnty.*, 799 F.2d at 1047; *cf Graham v. Evangeline Parish Sch. Bd.*, 223 F.R.D. 407, 420, 425 (W.D.La. 2004) (describing a 2001 consent decree which required the district to "prevent zone jumping and require students to attend the school in the zone in which they live"); *United States v. Avoyelles Parish Sch. Bd.*, Slip Copy, 2009 WL 1505305 at *3, *6 (W.D.La. May 28, 2009) (order district to

## 2.      Racially Identifiable and One-Race Schools

The Supreme Court has stated that the fundamental inquiry and "critical beginning point" in assessing a school district's compliance with a desegregation decree is determining the extent to which the racial enrollment at the schools deviates from the overall, district-wide racial enrollment for the comparable grade levels, *e.g.*, elementary, junior high, and high schools,"[50] and consequently whether a school is "racially identifiable."[51]  During the 2009-10 school year, the African-American and/or white enrollment at 34 of RISD's 55 schools – more than half of the District's schools – deviated by more than 15% from the district-wide racial composition for the corresponding grade levels, and 25 of the schools fell outside the +/-20% range.[52]  In fact, at the elementary school level, a majority of RISD's African-American students (55.7%) now attend

---

"immediately implement such remedial measures as are necessary to end the practice of students' attending school unauthorized outside of their attendance zone ("'zone jumping'")).

[50] *Freeman*, 503 U.S. at 474 ("a critical beginning point is the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole. This inquiry is fundamental.").

[51] Depending on the jurisdiction, courts typically use a deviation of +/-15% or +/-20%; and, for the purposes of this Opposition, the United States will use both variances *See, e.g., Belk*, 269 F.3d at 319 ("plus/minus fifteen percent variance is clearly within accepted standards, and provides a reasonable starting point in the unitary status determination.").

[52] *See* Pls' App. at US 002-003.  It should be noted that the District's Motion relies exclusively on enrollment variances in determining which schools are racially identifiable.  *See* Defs' Mot. at ¶¶ 54-57.  Likewise, for the purposes of this Opposition, the United States uses the term racial identifiable to refer to schools that have an African-American or white student enrollment that deviates by more than 15% from the district-wide racial composition for the corresponding grade levels.  During the 2009-10 school year, the District operated 11 racially identifiable Black schools – Forest Medow JHS, Aikin, Audelia Creek, Forestridge, Hamilton Park, Merriman Park, Northlake, Richland, Skyview, Stults Road, and Thurgood Marshall – and 14 racially identifiable white schools – Pearce HS, Parkhill JHS, Richardson North JHS, Big Springs, Bowie, Bretfield, Canyon Creek, Dartmouth, Mohawk, Moss Haven, Prairie Creek, Spring Creek, White Rock, and Yale.  *See* Pls' App. at US 002.  During the 2007-08 school year, all three Lake High-lands secondary schools and Forest Lane Academy also had dispro-portionately high African-American enrollments, which factored into the United States analysis of the data for those years, such as the District's discipline data.  *See* Pls' App. at US 004; *see also id.* at US 004.  As noted below, the full analysis used to determine whether a school is racially identifiable relies on multiple factors, *see infra* note 56, and the United States contends that RISD's assignment of faculty and staff reinforces the racial identifiability of the schools at issue in this case, *see infra* 36-38.

It is appropriate to note that the white enrollment at Hamilton Park shrank between the 2007-08 and the 2009-10 school years; 42 fewer white students attended the school during the 2009-10 school year, which represents almost an 18% reduction in the white enrollment.  *Compare* Pls' App. at DOJ 004 (240 white students)] *with id.* at DOJ 002 (198 white students).  The District does not explain this unusual reduction in the white enrollment, and the United States intends to explore this issue in discovery.

racially identifiable Black schools and a majority of the white students (55.6%) attend racially identifiable white schools.[53]

While racial disparities in enrollment between schools are not *per se* prohibited, the District must prove it made "every effort to achieve the greatest possible degree of actual desegregation."[54] The Court is required to scrutinize such disparities closely[55] and, in addition to enrollment figures, should examine other factors, such as community perceptions of the schools, faculty and staff assignments at the schools, and the other *Green* factors, which might aid the Court in determining the "[r]acial identification of the system's schools."[56]   "The [Supreme] Court's decisions make clear that there is a presumption in a former *de jure* segregated school district that the board's actions caused the racially identifiable schools, and it is the school board's obligation to rebut that presumption."[57]

The District claims that a racially identifiable school is one where the enrollment is greater than 80% – 90% of one particular race, mistakenly conflating "one-race" schools with "racially identifiable" schools.[58]   As demonstrated by the holding in *Freeman*, however, this approach is wrong.  Indeed, the Fifth Circuit has clearly stated that "students and faculty of a

---

[53] *See* Pls' App. at US 002.

[54] *See Swann*, 402 U.S. at 26.

[55] *See id.*

[56] *Green*, 391 U.S. at 435.  The Fifth Circuit has cautioned trial courts not to rely solely on mathematical variances in determining whether a school is racially identifiable.  *See Price v. Denison Indep. Sch. Dist.*, 694 F.2d 334, 362-63 (5th Cir. 1982) (citing favorably *Carr v. Montgomery Cnty. Bd. of Educ.*, 377 F.Supp. 1123, 1141 (M.D.Ala. 1974), *aff'd*, 511 F.2d 1374, *reh'g en banc denied*, 511 F.2d 1390 (5th Cir.), *cert. denied*, 423 U.S. 986 (1975)). Courts have rejected strict mechanical applications of numeric formulas when the complete analysis does not consider "other indicia in school desegregation cases such as faculty, transportation, facilities and extra-curricular activities."  *Carr*, 377 F.Supp. at 1141.  Thus, as the United States noted above, numeric disparities in enrollment are the starting point in determining whether a school is racially identifiable.

[57] *Freeman*, 503 U.S. at 512 n. 1.  Although the presumption is applied to any identified disparities, it is particularly strong when a district operates one-race or substantially one-race schools.  *See Swann*, 402 U.S. at 26; *Davis v. East Baton Rouge Parish Sch. Bd.*, 721 F.2d 1425, 1434 (5th Cir. 1983); *Lemon v. Bossier Parish Sch. Bd.*, 566 F.2d 985, 987 (5th Cir. 1978).

[58] *See* Defs' Mot. at ¶¶ 54-57.

school need not be all of a single race for the school to be considered racially identifiable."[59]
Moreover, the cases upon which the District relies – *Flax*, *Davis,* and *Singleton* – do not even
support the District's argument.[60]  On its face, *Flax* related solely to "one-race" schools, not
"racially identifiable" schools.[61]  RISD also relies on a portion of the holding in *Davis*, which,
when read in its entirety, properly distinguishes between "one-race" schools and "racially
identifiable" schools.[62]  Finally, using 90% as a numeric proxy for determining racially
identifiable Black schools was appropriate in *Singleton* because the district at issue in that case
had a 72% African-American student body, and 90% represented an 18% deviation from that
overall enrollment.[63]  Regardless, in addition to operating a number of racially identifiable
schools, the District concedes that it maintains at least six one-race schools, and the Court must
employ a presumption against the maintenance of such schools.[64]  Also, the Court must examine
why several of the historically white schools, such as Pearce, Richardson North, Bowie, Canyon

---

[59] *Lawrence Cnty.*, 799 F.2d at 1039; *see also id*. at 1040 (In a district with a 44% black student population, "the district court was clearly in error in failing to consider [a 36% black school] identifiably white").

[60] *See* Defs' Mot. at ¶¶ 54-57 (citing *Flax*, 915 F.2d at 158; *Davis*, 721 F.2d at 1431; *Singleton v. Jackson Mun. Sep. Sch. Dist.*, 541 F.Supp. 904, 910 (S.D. Miss. 1981)).

[61] *See Flax*, 915 F.2d at 161.  In fact, the phrase "one-race" school was used at least 12 times in the decision, including the portions of the decision on which RISD relies.  *See* Defs' Mot. at ¶ 54 n. 100 (citing *Flax*, 915 F.2d at 161 ("We must, therefore, address whether a student population of 80% renders those schools one-race schools"); *id*. at 161 n. 8 ("the parties had agreed to 80% as the percentage which would render a … school a one-race school")).

[62] *See* Defs' Mot. at ¶ 55 n. 101 (citing *Davis*, 721 F.2d at 1431).  The *Davis* opinion noted that the United States' expert in that case:

> defined a "predominantly one-race school" to be one with a student body 90% or more of a single race; he found 65 of the 98 schools in the system … were predominantly one-race.  Finally, he considered a school to be "racially identifiable" if the racial percentages reflected in the school's student body fell outside a range of 15 percentage points from the racial percentages reflected in the student population of the system as a whole.  Thus, [a] school would be racially identifiable if the black students in its population comprised less than 25% or more than 55% of the whole; of the 98 schools, he found 81 identifiably white or black.

*Davis*, 721 F.2d at 1431.

[63] *See Singleton*, 541 F.Supp. at 910.  If courts adopted RISD's approach and used 80% to determine racially identifiable schools, it would lead to an absurd result.  For example, using the District's approach in a school district that is 80% white would mean schools in that district that were 85% white would be considered racially identifiable when the correct analysis would require only that the court to examine the schools that are 95% white.

[64] *See Swann*, 402 U.S. at 26 ("The court should scrutinize [schools that are all or predominantly of one race], and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part"); *see also Davis*, 721 F.2d at 1431; *Tasby v. Wright*, 713 F.2d 90, 94 (5th Cir. 1983); *Valley*, 646 F.2d at 937; *Anderson v. Dougherty Cnty. Bd. of Educ.*, 609 F.2d 225 (5th Cir.1980).

Creek, Mohawk, Prairie Creek, Spring Creek, and White Rock are still majority white, particularly when, as the District notes, RISD is now a majority-minority district.

While RISD is correct that a district is not required to "achieve racial balance in student assignments … when the imbalance is attributable neither to the prior de jure system *nor* to a later violation by the school district but rather to independent demographic forces," the inverse argument remains true.[65]  "If the unlawful *de jure* policy of a school system has been the cause of the racial imbalance in student attendance, that condition must be remedied," and "[t]he school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation."[66]  Here, the District has not shown that the existing disparities are the result of actions outside RISD's control.  To the contrary, several of RISD's actions since the Court approved the 1997 Order had the effect of furthering the segregation of the schools, and at least two of these actions were in violation of the Court's Order.

In 1999, the District did not open Forest Lane Academy as a magnet school as contemplated by the Court in 1997, but rather as a residentially zoned school.[67]  As approved by the Court, RISD's proposed magnet school was expected to bring together students from several schools, including predominantly Black schools, such as Stults Road and North Lake, and predominantly white schools, such as Moss Haven and White Rock.[68]  Instead, RISD unilaterally changed the

---

[65] *Freeman*, 503 U.S. at 493 (emphasis added); *see* Mot. at ¶ 45.

[66] *Freeman*, 503 U.S. at 494.

[67] *See* 1997 Motion at 11; 1997 Order.  Courts have uniformly acknowledged that magnet schools and controlled choice programs, when properly designed and implemented, are an excellent tool for remedying racial segregation. *Cf Belk*, 269 F.3d at 403.

[68] The 1997 Motion stated that "[t]he district plans to build an elementary school in the Lake Highlands High School area," which "could be a magnet serving students from projected overcrowded schools such as Aikin, Richland, Forestridge and Stults Road Elementary Schools, as well as volunteer students from the remainder of the Lake Highlands High School."  *See* 1997 Motion at 11.  The other elementary schools within the Lake Highlands High Schools area, included Merriman Park, Moss Haven, Skyview, Lake Highlands, North Lake, Wallace, and White Rock.  *See* 1997 Motion at Exh. E.  The 1997 Plan did not project the racial enrollment at the new magnet school. *See* 1997 Plan at 34.  However, according to RISD's 1997 Annual Report, Stults Road and North Lake had African-American enrollments of was 66% and 58%, respectively, and Moss Haven and White Rock had white enrollments of was 73% and 54%, respectively.  *See* RISD Annual Report at Attach. A.(Apr. 14, 1997).

Court-ordered attendance zones and opened Forest Lane Academy with an African-American

enrollment of 65% and a white enrollment of only 8%.[69]  To accomplish this, the District changed

the Court-ordered attendance zones.[70]  While some courts use three years as a benchmark for

assessing whether districts have remained compliant for the requisite reasonable period of time,[71] in

this instances, RISD circumvented the Court's 1997 Order in less than two years.

Then, RISD constructed two other racially identifiable Black schools and redrew at least six

attendance zones without authorization from the Court.[72]  In 2003, RISD opened Audelia Creek

and, in 2005, it opened Thurgood Marshall.  Not only were these schools opened without the

Court's approval, but the District sited the schools and redrew the Court-ordered attendance zones

so that both schools opened as racially identifiable Black schools.[73]  Audelia Creek had a projected

---

[69] According to the District's 1998 Annual Report, RISD was "bidding on a tract for a new elementary magnet .… located on the north side of Forest Lane," and the District went on to state that it "plans to develop a magnet program at this school, where students would be assigned through a random selection process."  RISD Annual Report at 2-3 (Apr. 14, 1998) (stating that "[t]he race of the students served in the school would be reflective of the district average and would be determined by parameters set prior to the random selection process.").  However, the District's 1999 Annual Report stated that "[t]he District is currently building a new elementary school located at 9669 Forest Lane" and described the new school's geographic boundary.  RISD Annual Report at 2 (Apr. 14, 1999).  According to the District's 2000 Annual Report, 424 African-American and 52 white students were assigned to Forest Lane Academy.  *See* RISD Annual Report at Attach. A (Apr. 14, 2000).

[70] *See* RISD Annual Report at 2 (Apr. 14, 1999); *see also* Pls' App. at US 006; RISD 2010-2011 Map, http:// www.risd.org/Group/Global/Global_Docs/FullMap.pdf (illustrating Forest Lane Academy's boundaries and not listing the boundary as a "choice [or] managed choice attendance zone").

[71] *See Anderson*, 517 F.3d at 297 ("For at least three years, the school board must report to the district court.") (quoting *Monteilh*, 848 F.2d at 629); *see also Lemon v. Bossier Parish Sch. Bd.*, 444 F.2d 1400, 1401 (5th Cir. 1971) ("the district in question must have for several years operated as a unitary system.").

[72] *But see* 1970 Order at 5 ("All school construction … and site selection … shall be done in a manner which will prevent a dual school structure, and further shall be planned and carried out so as to achieve the objective of promoting the continuing, complete desegregation...").

[73] *See* RISD Annual Report at Attach. A (Apr. 14, 2004); RISD Annual Report, Attach. B (Apr. 13, 2006); *compare* 1997 Motion at Exh. E (illustrating the court-approved attendance zone lines) *with* RISD Annual Report at Attach. E (Apr. 15, 2005) (illustrating the new attendance boundaries).  According to the District's 2002 Annual Report, RISD would "seek approval from the Court for a revised student assignment plan when it determines appropriate boundaries for the school" that became Audelia Creek.   RISD Annual Report at 2 (Apr. 12, 2002) (acknowledging that an "east side" school was not contemplated by the Court's 1997 Order); *see similarly* RISD Annual Report 4 (Apr. 15, 2005) (stating that RISD "will identify necessary changes in the student assignment plans [related in part to Thurgood Marshall] and will promptly submit it for the Court's review and approval.").  However, no motion was submitted to the Court for approval, and the site selection and construction on these schools had already begun as early as September 2002.  *See* RISD Annual Report at Attach. B (Apr. 9, 2003).  *But see* Defs' Mot. at ¶ 18 ("RISD has regularly sought and obtained court approval for changes to the school attendance plans designed to ensure that the school district was moving forward toward compliance with the Court's orders."); *see also Swann*, 402 U.S. at 26 (when a district operates schools with a substantially disproportionate racial composition, there is a presumption that

African-American enrollment of 66% and an actual enrollment of 70%, and Thurgood Marshall had

a projected African-American enrollment of 79% and an actual enrollment of 83%.[74]

      While discovery will be needed to fully understand the cause, it is already evident from the

record that RISD routinely fails to properly project the racial composition of its schools, and the

District cannot show that the 1997 Order was effective, in part, because the projected enrollments

contained in its 1997 Plan were not accurate.[75]  Indeed, the enrollment projections contained in the

District's 1997 Plan for many of the schools were proven incorrect by 1998 – just one year later.[76]

For example, RISD projected that the white enrollment would be 73% at Pearce and 75% at

Parkhill, but the actual white enrollment at those schools was 83% and 82%, respectively.[77]  The

District stated that the white enrollment would be 31% at Aikin and 29% at Skyview, and the actual

white enrollment at the schools was and 22% and 18%, respectively.[78]  Today, these, and several of

the District's other schools remain racially identifiable.[79]

### 3.      RISD's Transfer Policy

      As noted above, each year RISD grants hundreds of intra-district student transfers that are

not authorized by the Court's order and do not further desegregation of schools.[80]  In fact, during

---

conversion to a unitary system is incomplete); *Davis*, 721 F.2d at 1434; *Lemon*, 566 F.2d at 987. It also should be noted that in 2005 the District unilaterally closed Richardson Junior High School and made adjustments to some other elementary schools, see RISD Annual Report at 2-3 (Apr. 13 2006), but it is unclear whether these changes to the court-ordered feeder pattern or assignment plan had any impact on the racial composition of the schools.

[74] *See* RISD Annual Report at Attach. B (Apr. 9, 2003); RISD Annual Report at Attach. A (Apr. 14, 2004); RISD Annual Report at Attach. B (Apr. 15, 2005); RISD Annual Report at Attach. A (Apr. 13 2006).

[75] To the extent the United States must render a guess as to the cause, it notes that RISD mistakenly relies on census data when compiling its demographic studies and the reports, themselves, do not appear to analyze the racial compositions of the schools. *See infra* note 107.  Indeed, the 1997 Plan reported the racial composition of the schools as "White" and "Other," requiring the Court to guess as to the projected enrollment of African-American students.  *See* 1997 Plan at 24-34.

[76] *Compare* 1997 Plan at 24-34 *with* RISD Annual Report at Attach. A (Apr. 14, 1998).

[77] *Compare* 1997 Plan at 24-25 *with* RISD Annual Report at Attach. A (Apr. 14, 1998).

[78] *Compare* 1997 Plan at 27, 32 *with* RISD Annual Report at Attach. A (Apr. 14, 1998).

[79] *See* Pls' App. at US 002; *see also supra* 11-12 (explaining the process used to determine whether a school is racially identifiable school).

[80] The 1970 Order established attendance zones and authorized only two types of transfers: (1) M-to-M transfers; and (2) inter-district transfers that do not have a cumulative effect of reducing desegregation in either the sending or receiving districts.  *See* 1970 Order at 1-2, 5-6.  The 1997 Order authorized RISD's "managed choice" program,

the 2007-08 school year, RISD granted 670 such transfers just at elementary school level.[81]

Most of these transfers were granted with no record of the reason for the authorization, and

several of them appear arbitrary and discriminatory.[82]  For example, one parent requested and

was granted a transfer because the sending school "lacks cultural diversity" (no reason was given

for granting the transfer), while another parent requested and was denied a transfer when the

parent believed a teacher at the sending school "had a racist attitude" (the transfer was denied to

"support neighborhood school").[83]  Shockingly, the District's Motion makes no mention of these

transfers, but claims instead, without substantiation, that "racial demographic shifts" and alleged

changes to "residential housing patterns" caused the racial disparities in its schools.[84]

     To achieve unitary status, however, the District must demonstrate that the student transfers,

which are wholly in its control, have no such impact.[85]  Indeed, the District must prove that its intra-

district student transfer practices were authorized by the Court's order, that such transfers are not

---

which altered the feeder patterns between certain schools, but stated that all prior orders remain in full force and
effect, and RISD is supposed to maintain and enforce the neighborhood school concept and corresponding
attendance zones at the elementary school level.  *See* 1997 Order at 1.  The 1997 Order does not expressly authorize
the creation of centralized special education programs or full-day kindergarten programs at certain schools, but
RISD's assignment plan anticipated the creation of these programs, and the Unites States believes these two
additional exceptions to the attendance zones were authorized by the Court.

[81] *See* Pls' App. at US 007-008.  For the purposes of this Opposition, the United States does not address the
District's inter-district transfers, and the United States will need further discovery on RISD's recent practices with
respect to both types of transfers.

[82] *See, e.g.,* Pls' App. at US 009-019.

[83] *See* Pls' App. at US 019.

[84] *See, e.g.,* Defs' Mot. at ¶ 47.  It should be noted, again, that RISD bears the burden of proof in this matter, and the
District's Motion does not offer so much as a scintilla of evidence in support of its claims concerning demographic
shifts, relying instead on the naked assertions of its attorneys, who states, simply that: "[t]here is no evidence that
RISD caused this shift" and "RISD had nothing to do with it."  *Id*.  Also, the District's references to student transfers
are limited exclusively to RISD's policies concerning inter-district transfers, which the United States intends to
explore during discovery.  The District does not disclose to the Court that it permits hundreds of intra-district
transfers each year.  Nor does it disclose the full impact of its "overflow procedures," *see* Defs' Mot. at ¶ 39, which,
based on information and belief, impacts as many as 800 student each year.

[85] *Harris*, 968 F.2d at 1096 (citing *Freeman*, 503 U.S. at 493-494); *United States v. Lowndes Cnty. Bd. of Educ.*, 878
F.2d 1301, 1305 (11th Cir. 1989) ("if a school system's violation of its duty to desegregate has been the cause of a
racial imbalance in student attendance, then the condition must be remedied.").

granted or denied on a discriminatory basis and that they do not reinforce the dual school system.[86]

It also must show that it has complied with the Court's Order concerning M-to-M transfers and has

not approved or denied such transfers to support neighborhood schools.

As the Fifth Circuit explained, "[t]he first step of a transfer analysis looks at the quantitative

effect of the transfers,"[87] measured on a "school-by-school" basis.[88]  Such a "cumulative effect"

analysis compares the difference between the schools' current racial enrollment with the transfers

and the schools' enrollment if there were no student transfers.[89]  While small quantitative changes in

the racial composition of a school through transfers may not necessarily trigger mandatory remedial

action, the Court also must analyze the "qualitative impact of the transfers."[90]  Specifically, the

Court must determine whether the transfers are likely "to alter significantly general perceptions of a

school's racial identity or the behavior of persons who rely on such factors in determining whether

or not to send their children to a particular school."[91]  Moreover, "the range of deviation may be

significant in measuring qualitative segregative effect."[92]  For example, "a transfer program which

has the effect of increasing the black student population in a particular school from 90% to 100%

---

[86] *See, e.g., United States v. Texas*, 457 F.3d 472, 478 (5th Cir. 2006) (holding that in school desegregation cases courts must review student transfers from both a qualitative and a quantitative perspective); *see also Lowndes Cnty.*, 878 F.2d at 1305.  At issue for the Fifth Circuit in *United States v. Texas* was whether the State violated Order 5281, which stated that TEA "shall not permit, make arrangement for or give support of any kind to student transfers, between school districts, when the cumulative effect, in either the sending or receiving district, will be to reduce or impede desegregation."  *United States v. Texas*, 447 F.2d 441, 443 (5th Cir. 1971); *see also Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1418 (11th Cir. 1993) ("transfers are deemed to increase the duality of a school system when they increase the racial identifiability of the schools in the system"); *Harris*, 968 F.2d at 1096 (when a district "permit[ed] white students to transfer out of [a majority black] zone" it was "violation[ing] its duty to desegregate" by reinforcing the prior dual system); *United States v. Wilcox Cnty. Bd. of Educ.*, 494 F.2d 575, 579-80 (5th Cir. 1974) (finding a minority-to-minority intra-district transfer plan which allowed white students to concentrate themselves in a single school unconstitutional when the district had not yet eliminated vestiges of the prior dual system).
[87] *Texas*, 457 F.3d at 479.
[88] *Lee v. Eufaula City Bd. of Educ.*, 573 F.2d 229 (5th Cir. 1978).
[89] *See, e.g., United States v. Texas*, 2005 WL 1868844, at *26 (E.D.Tex. 2005).
[90] *Lee v. Lee County Bd. of Educ.*, 639 F.2d 1243, 1261 (5th Cir. 1981).
[91] *Lee*, 639 F.2d at 1261; *see also Lowndes*, 878 F.2d at 1306 ("What compels our decision in this case is whether [the] increment of change is likely to aggravate or alter popular perceptions of [the school's] racial identity and whether it affects the decisionmaking process of white students considering where to attend school.").
[92] *Texas*, 457 F.3d at 479 (quoting *Eufaula*, 573 F.2d at 233 n. 9).

may be more suspect than a corresponding 10% increase from 50% to 60%."[93]  Ultimately, the

District has an obligation to prevent any transfer that has the effect of impeding desegregation by

establishing or reinforcing racially identifiable schools.[94]

Although discovery will be needed to determine the full extent of the impact the student

transfers have on school enrollment, particularly in recent years, the available data suggests that the

transfers RISD granted during the 2007-08 school year, including the 670 elementary level

transfers, not only failed to further the desegregation of the District's schools, but had a negative

effect on the racial composition of the schools.[95]

First, RISD permitted a large number of African-American students to transfer into racially

identifiable Black schools, such as Aikin (14), Forest Lane Academy (10), Northlake (10), Richland

(12), and Skyview (14).[96]  These five schools received nearly a third of the 180 transfers the District

granted to African-American elementary school students.  In fact, 44% of the transfers of African-

American students placed them at one of the eight racially identifiable Black elementary schools.[97]

RISD allowed a large number of white students to transfer into schools that were already racially

identifiable as white, such as Canyon Creek (20), Moss Haven (26), Prairie Creek (11), Spring

---

[93] *Texas*, 457 F.3d at 479 (quoting *Eufaula*, 573 F.2d at 233).

[94] *See Eufaula*, 573 F.2d at 233 n.10 ("it may be appropriate to enjoin the transfer of students … if the transfer policy has the effect of reducing desegregation or reinforces the existence of a dual school system in each attendance zone within the county"); *see also Lowndes Cnty.*, 878 F.2d at 1305; *United States v. Sch. Dist. of Omaha*, 521 F.2d 530, 540 n.19 (8th Cir. 1975) ("Other courts have noted that a transfer policy having segregative effect may be strong evidence of unconstitutional segregation") (citing cases); *NAACP v. Lansing Bd. of Educ.*, 559 F.2d 1042, 1051 (6th Cir. 1977) ("Where the foreseeable and actual result of a transfer policy is to increase the racial identifiability of schools with large minority enrollment, continuation of the policy gives rise to a presumption of segregative intent.") (citations omitted).

[95] *See* Pls' App. at US 007-008.

[96] *See* Pls' App. at US 008.  These represent only the double-digit transfers of African-American students to the elementary schools.  *See also Lansing*, 559 F.2d at 1051 ("A policy which allows transfers from racial minority schools to racial majority schools invites abuse, and where such abuse occurs and is ignored by school authorities it is tantamount to an authorization for white students to flee and is an obvious means for the perpetuation of segregation.") (citations omitted).

[97] *See* Pls' App. at US 008 (Aikin (14), Audelia Creek (6), Forest Lane Academy (10), Northlake (10), Richland (12), and Skyview (14), Stults Road (4), and Thurgood Marshall (9)).

Creek (14), White Rock (13), and Yale (10).[98]  These six schools received nearly half of the 208

transfers RISD approved for white elementary school students.  Almost 60% of the transfers granted

for white students placed them at one of the 11 racially identifiable white elementary schools.[99]

A similar trend emerges on examination of the schools from which students are allowed to

transfer.[100]  For example, the District permits white students to transfer out of schools where the

white student enrollment is less than 10%, such as Northlake (29) and Skyview (13).[101]  In fact, the

District permitted ***32%*** of the white students who were assigned to Northlake to leave that school,

reducing the number of white students at the school from 85 (9.8%) to 58 (6.9%).[102]  Likewise, the

District allowed ***22%*** of the white students who were assigned to Skyview to leave that school,

reducing the number of white students at the school from 55 (7.8%) to 43 (6.3%).[103]  A qualitative

analysis is particularly important when examining the impact RISD's transfer policies have on these

majority African-American schools because the transfer of only a small number of white students

appears to perpetuate white flight from majority African-American schools, thus, reinforcing the

perception that such schools are intended for African-American students.[104]  RISD's actions are

even more egregious given that it has denied students the opportunity to transfer pursuant to the M-

to-M transfer program, as directed by the Court.[105]

---

[98] *See id*.  These represent only the double-digit transfers of white students to the elementary schools.
[99] *See id*.
[100] *See* Pls' App. at US 007.
[101] *See id*.
[102] *See id*.
[103] *See id*.
[104] *See, e.g., Price*, 694 F.2d at 342-43 (discussing expert testimony concerning the "tip ratio," the point when "white flight" from school with disproportionately high African-American enrollment increases precipitously, which is "usually experienced in Texas [when an enrollment] of approximately 35% black were reached.  "Once a school's black population] reaches that 35%, then it seems to jump very quickly to 50 to 60 and move very fast to become a minority school [because] [t]he patrons find some way to another elementary zone." (internal quotes omitted)).
[105] *See infra* 23-25.

The District entirely disregards its affirmative duty to monitor or analyze the impact of its transfers.[106]  Surprisingly, the report of incoming and outgoing student assignments it provided in support of its Motion is devoid of any data on race, making it useless from an evidentiary stand-point in a desegregation case.[107] Also, as noted above, a vast majority (490 of 670) of the elementary school transfers were granted with no record of the reason for the authorization.[108]  Moreover, the process used to approve or deny student transfers also is suspect, and reinforces the negative qualitative impact of the transfers.  Among other things, the categories of permissible transfers, to the extent there are any, are unclear and RISD's written transfer policy is vague on its face.[109]

The discriminatory impact of RISD's transfer process speaks for itself.  For example, a first grade African-American student requested a transfer into Brentfield during the 2007-08 school year because his or her special needs sibling was attending the school, but RISD denied the

---

[106] This assertion is based on interviews conducted during the United States' site visit, and will need to be further evidenced through discovery.  According to the RISD Student Handbook (2010-2011), the only factors the District monitors are related to capacity, such as space, staffing, and class sizes.  *See* Pls' App. at US 020-021; RISD, *The Student/Parent Guidebook and Student Code of Conduct*, App H (2010-2011), http://www.risd.org/Group/Parents/ Student_Services/GuidebookCode.html.

[107] *See* Defs' Mot. App. at 183-275.  As noted above, *see supra* note 8, much of the District's Appendix is blacked out, but it appears that the student enrollment data contained therein is reported by grade, not race.  *See* Defs' Mot. App. at 183-275.  These pages constitute nearly a third of the 291-page exhibit, but provide no data about the racial composition of the schools.  Indeed, it seems fairly obvious that Templeton Demographics' report was not commissioned to address the issues in the case.  With the exception of two pages, *see id*. at 062-063, and some irrelevant census data, *see id*. at 276-291, the report is devoid of any information concerning race; rather, it contains data related to economic conditions and land use.  *See id*. at 004.

It should be noted that courts routinely question the probative value of generic census data in school desegregation cases because such data does not relate to the students enrolled in the system's schools.  *See, e.g.*, *Penick v. Columbus Bd. of Educ.*, 429 F. Supp. 229, 237 (S.D. Ohio 1977); *Higgins v. Bd. of Educ.*, 395 F. Supp. 444, 450 (W.D. Mich. 1973); *Goss v. Bd.of Educ.*, 340 F. Supp. 711, 715 (E.D. Tenn. 1972).  Here, for example, the census data contained in RISD's Appendix reports the race of all of the residents of Richardson, not delineated by census tracks/ blocks or age.  Even if the District replaced this exhibit with "under-17" data delineated by census block, it would still erroneously includes students who are too young to attend school, are home schooled, and attend private schools, and the 2000 data would be outdated.  The proper data source is the student locator data contained in RISD's computer systems, which the District will need to produce through discovery.

[108] *See e.g.*, Pls' App. at US 009-019. It should be noted that concerns regarding the District's arbitrary transfer practices have been raised by the community.  In fact, the RISD Parent Advisory Committee presented the following questions to the District: "How can it be so easy to transfer from one school to another when there is no obvious performance issue with the home attendance area school?  Does RISD put transfer requests on public record?  What is the rationale for granting transfers? What is being done institutionally at these schools to address the reasons for the transfers?"  See RISD, *FAQs, Q&A from the RISD Parent Advisory Committee* (Feb. 22, 2011), http://www.risd.org/group/aboutrisd/ FAQs.html.

[109] *See* Pls' App. at US 020-021.

transfer on the stated basis of "No Space Available."[110]   By contrast, the District allowed at least

three white first graders to transfer to Brentfield, including one student who requested the

transfer so s/he could attend the school with his or her sibling (no reason was given for granting

this transfer).[111]   During the 2007-08 school year, Brentfield was a racially identifiable school

with a white enrollment of 83.7% and an African-American enrollment of only 2.4%.[112]   The

District's data reveals similar examples of African-American students being denied transfers

based on a supposed lack of space, while similarly situated white students were granted transfers.

For example, a fourth grade African-American student was denied a transfer from Thurgood

Marshall, a predominantly Black school, into Spring Creek, a predominantly white school, while

five white fourth graders were granted transfers to the school (three for no explained reason).[113]

Independent of its desegregation obligations, RISD's decision to allow white students to transfer

to certain schools while denying similarly situated African-American students the same option

rises to the level of discriminatory disparate treatment.

    The District also has denied transfers to African-American students for the stated reason

of "support[ing] neighborhood school[s]," while simultaneously granting such transfers to white

students.[114]   For example, two African-American students were denied a transfer to Mohawk, a

racially identifiable school with a white enrollment of 82.2%, while eight white students were

granted transfers to the school (five for no explained reason).[115]   Indeed, it appears that both of

the African-American students – sixth graders – had previously attended Mohawk, but moved

---

[110] *See* Pls' App. at US 011.

[111] *See id.*

[112] *See* Pls' App. at US 004.

[113] *See* Pls' App. at US 011; *id.* at US 004.  It also should be noted that several of the white students report that their siblings attended the school, which suggests that the pattern of allowing white students to attend certain schools outside their residential attendance zones has continued for several years.

[114] *See* Pls' App. at US 014-018.  For the purposes of the Opposition, the United States does not take a position as to whether these transfers, had they been granted, would have furthered the desegregation of the RISD schools.  Nor does the District justify its decision to grant and/or deny the transfers on this basis.

[115] *See* Pls' App. at US 014; *id.* at US 004.

and wanted to remain at the school for one more year in the interest of continuity.[116]

Nevertheless, both of the transfers were denied while a white fifth grader whose family had

moved was allowed to stay at the school.[117]   In at least one instance, a white student was denied

transfers to Aikin on the basis of "support[ing] neighborhood school[s]."  During the 2007-08

school year, Aikin was a racially identifiable Black school with an African-American enrollment

of 46.2%, and the District allowed 14 African-American students to transfer to the school (10 for

no explained reason).[118]

   Racial disparities in the transfer data are similarly evident at the aggregate level.  For

example, a comparable number of African-American and white students requested transfers, but

the rate of approvals (and denials) was starkly disparate.[119]  In fact, white students were 21%

more likely to be granted a transfer than their African-American counterparts.  Conversely,

African-American students were 80% more likely to be denied a transfer.  It also should be noted

that RISD refused to offer a justification for 15% of the African-American students who were

denied a transfer.  By contrast, not a single white student had his or her transfer denied for "no

reason given" by the District.[120]   Ultimately, the District's student transfer policies and practices

severely undercut the District's move toward achieving unitary status.

   Likewise, the District failure to fully implement the court-ordered M-to-M transfer

program should prevent RISD from being declared unitary in the area of student assignment.[121]

---

[116] *See* Pls' App. at US 014.
[117] *See id*.  Similarly, two African-American students – a third grader and a fourth grader – were denied continuity transfers to Dartmouth, a racially identifiable school with a white enrollment of 53.3%, while five white students were granted transfers to the school, including a white first grader whose family had moved.  *See id*.
[118] *See* Pls' App. at US 018.
[119] Based on the data the District provided to the United States in response to its 2008 information request, 265 African-American students requested transfers, but 85 (32.1%) of the transfers were denied.  By contrast, 253 white students requested transfers, but only 45 (17.8%) of those transfers were denied.
[120] *See* Pls' App. at US 009-019.
[121] *Cf. Tasby*, 869 F.Supp. at 461-63.

Courts routinely require school districts to implement M-to-M transfer programs because they are a practicable and effective means of addressing racial disparities in student assignment while simultaneously allowing parents greater choice in deciding what schools their children attend. However, prior to the United States' 2009 site visit, the only notice RISD disseminated to parents regarding the M-to-M transfer option was the annual letter it sends only to the parents who attend Hamilton Park Magnet School;[122] the informational materials RISD provided to parents, including its website and handbooks, contained no mention of this transfer option, and many of the principals were not aware that the option existed.[123]  It also is unclear whether RISD provides transportation to students who request an M-to-M transfer, as required by the Court.[124] At a minimum, the District's public statements concerning transportation are vague, and it is unlikely that the typical parent is aware that such transportation is available.[125]

Moreover, a cursory review RISD's records reveal several examples of instances where the District denied students' requests for transfers that should have been granted pursuant to the M-to-M transfer provisions of the Court's 1970 Order.  For example, during the 2007-08 school year, an African-American student was denied a transfer from Richland, a predominately Black

---

[122] *See, e.g.*, RISD Fall Semester Report (ECF No. 15) at Exh. B (Sep. 9, 2010).  These students, however, are unlikely to seek such a transfer because they have already elected to attend Hamilton Park pursuant to the District's magnet school program.

[123] After the United States conducted its site visit and notified RISD that it was concerned that the District's failure to broadly disseminate information regarding the M-to-M transfer option, RISD inserted a notation about M-to-M transfers in its Student Handbook, but did not revise the corresponding transfer policy.  *See* Pls' App. at US 020-021.  Regardless, the District's initial refusal to publicize the M-to-M transfer option resulted in no student electing to request such transfer during the 2007-08 school year.  *But see Tasby*, 869 F.Supp. at 461 (finding that 524 students participated in the M-to-M transfer program and ordering the district to "[p]rovide better publicity about the M to M Program and its incentives to students and parents").

[124] *See* 1970 Order at 5.

[125] *See* Pls' App. at US 021 ("RISD does not provide transportation for transfer students unless otherwise required by law.  Parents whose transfer requests are approved will be responsible for providing transportation to and from the campus"); *but see* RISD Fall Semester Report (ECF No. 15) at Exh. B (Sep. 9, 2010).  *See Tasby v. Wright*, 520 F.Supp. 683, 749 (D.C.Tex. 1981) (expressing surprise at the number of parents who were unaware that the district provided free transportation for M-M transfers, identifying this lack of information as the district's "chief problem," opining "that information about this program must be more effectively communicated to the minority community," and directing the district to submit proposals toward that end.), *rev'd in part on other grounds*, 713 F.2d 90 (5th Cir. 1983).

school that had a 54.5% African-American enrollment, to Dartmouth, a predominately white school that had a 53.3% white enrollment and RISD's purported reason for denying this transfer was to support its "[h]ome school concept."[126]  Similarly, an African-American student requested a transfer from Thurgood Marshall to Lake Highlands because the student was attending Lake Highlands and was making great progress, but the District denied the student's request to "[s]upport neighborhood schools."[127]  The denial of these transfer requests for the reasons given constitutes a blatant noncompliance with the Court's Order and a failure by the District to fulfill its obligation to desegregate its schools and not reinforce a dual system.

### 4. Demographic Shifts

The District argues that it is entitled to a declaration of unitary status because it established residential attendance zones and the continued segregation of its schools – the "perceived constitutional violations" – is caused by demographic changes within the community.[128]  As noted above, however, the District's unsubstantiated, conclusory claim of "racial demographic shifts" and "residential housing patterns" do not support a finding of unitary status.  RISD has not provided any evidence that demographic changes occurred and that such changes are the cause of the racial disparities in student assignments.  While the District is correct that a district is not required to adjust its attendance zones on an annual basis when changes in the racial composition of the schools are caused by factors outside its control, RISD did not fulfill its obligation by merely adopting a race-neutral policy.[129]  Such a proposition would render the Supreme Court's decision in *Green*

---

[126] *See* Pls' App. at US 022; *id*. at US 004.

[127] *See* Pls' App. at US 022; *id*. at US 004.  Presumably, the student moved out of the Lake Highlands zone.

[128] *See* Defs' Mot. at ¶ 4.

[129] *See West Carroll Parish*, 477 F.Supp.2d at 763; *see also Belk*, 269 F.3d at 334.  To the extent the District relies on the Supreme Court's decision in *Pasadena City Bd. of Ed. v. Spangler*, 427 U.S. 424 (1976), to support its assertion, the United States notes that the facts in that case differ significantly from the present case and the Court's ultimate holding relied on at least three preliminary findings not present here.

useless.[130]  To the contrary, until it has achieved unitary status, the District has an affirmative

obligation to address any such demographic shifts when taking any actions related to school

construction, site selection, or the alterations of school attendance zones, including: in 1997, when

the District altered its attendance zones; in 1998, when it was apparent that the projected

enrollments were not realized; in 1999, when it changed its attendance zones and opened Forest

Lane Academy; in 2003, when it opened Audelia Creek; and, in 2005, when it opened Thurgood

Marshall.[131]  As the Fifth Circuit explained in *Davis v. East Baton Rouge Parish School Board*:

> Until it has achieved the greatest degree of desegregation possible under the circumstances,
> the Board bears the continuing duty to do all in its power to eradicate the vestiges of the dual
> system.  That duty includes the responsibility to adjust for demographic patterns and
> changes that predate the advent of a unitary system.  The racial isolation of some schools,
> whether existing before or developing during the desegregation effort, may render
> disestablishment of certain one-race schools difficult or even impossible.  Until all
> reasonable steps have been taken to eliminate remaining one-race schools, however, ethnic
> housing patterns are but an important factor to be considered in determining what further
> desegregation can reasonably be achieved; they do not work to relieve the Board of its
> constitutional responsibilities.  Changes in neighborhood ethnicity taking place after school
> officials have transformed their system into a unitary one need not be remedied, of course,
> for school officials are under no duty to adjust for the purely private acts of those who chose
> to vote with their feet.  But until it can show that all reasonable steps have been taken to
> eliminate remaining one-race schools, the Board must in its pursuit of a unitary system
> respond as much as reasonably possible to patterns and changes in the demography….[132]

While RISD was not required to respond to year-to-year demographic shifts caused by

factors outside its control, it had an affirmative duty to act whenever it chose to do so, in a manner

---

[130] The Supreme Court in *Green*, held that "freedom-of-choice" student assignment plans were shown to be an
unrealistic and insufficient means of dismantling the prior de jure system in the school district at issue in the case.  *See
Green*, 391 U.S. at 441.

[131] *See Davis*, 721 F.2d at 1434 ("The Board's reliance on housing patterns as justification for the continued
existence of one-race schools is not only factually but legally unsound"); *see also Lee v. Macon Cnty. Bd. of Educ.*,
616 F.2d 805, 810 (5th Cir.1980); *United States v. Bd. of Educ. of Valdosta*, 576 F.2d 37, 38 (5th Cir.), *cert. denied*,
439 U.S. 1007 (1978); *Valley*, 646 F.2d at 937.

[132] *Davis*, 721 F.2d at 1435 (internal cited omitted); *see also Macon Cnty.*, 616 F.2d at 810 ("Not until all vestiges of
the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools.");
*Lee v. Autauga Cnty. Bd. of Educ.*, 514 F.2d 646, 648 (5th Cir. 1975) ("Even if integration of the … schools failed
because of the establishment of the private academy and without the slightest participation by the state or the county,
the Board cannot simply ignore that failure" in making determinations with respect to new school construction.).

that furthered the desegregation of its schools.[133]  As the Supreme Court has explained, the siting

and construction of new schools are decisions that have a significant impact on the racial

composition of a district's schools:

> The construction of new schools and the closing of old ones are two of the most important
> functions of local school authorities and also two of the most complex. They must decide
> questions of location and capacity in light of population growth, finances, land values, site
> availability, through an almost endless list of factors to be considered.  The result of this will
> be a decision which, when combined with one technique or another of student assignment,
> will determine the racial composition of the student body in each school in the system.  Over
> the long run, the consequences of the choices will be far reaching.  People gravitate toward
> school facilities, just as schools are located in response to the needs of people.  The location
> of schools may thus influence the patterns of residential development of a metropolitan area
> and have important impact on composition of inner-city neighborhoods.[134]

These decisions are fully within the power and control of the District.  RISD has not shown

it has heeded the Court's 1970 or 1997 Orders or fulfilled its affirmative obligation following the

issuance of the 1997 Order.

Ultimately, the record in this case militates against a finding that RISD has achieved unitary

status in the area of student assignment.  As the District notes, the Supreme Court, in *Freeman*, took

favorable notice of the fact that the school district undertook affirmative steps to combat the effects

of the demographic shifts by establishing a bi-racial committee, implementing M-to-M transfers,

and instituting a magnet school program.[135]  The District further observes, in *Freeman*, that the

Court's "focus was on the district's policy to combat demographic shifts." [136]   The record in this

case, however, reveals that RISD took no such efforts.  Rather, RISD has not fully adopted a M-to-

---

[133] *See Harris*, 968 F.2d at 1095 ("the duty to desegregate is violated if a school board fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities."); *Hull*, 1 F.3d at 1459; *see also Swann*, 402 U.S. at 21; *Anderson*, 232 F.3d at 453.
[134] *Swann*, 402 U.S. 20-21.
[135] *See* Defs' Mot. at ¶ 50 (citing *Freeman*, 503 U.S. at 479).
[136] *See* Defs' Mot. at ¶ 50.

M transfer program, does not appear to be fully responsive to issues raised by the BRAC, and did

not open Forest Lane Academy as a magnet school.[137]

      Based on the District's noncompliance with the Court's orders, including its decisions

concerning school construction, school sitings, and attendance zones, as well as student transfers,

including decisions concerning M-to-M transfers, and its refusal to modify its ineffective plan,

RISD failed its obligation "not only to avoid any official action that has the effect of perpetuating or

reestablishing a dual school system, but also to render decisions that further desegregation and help

to eliminate the effects of the previous dual school system" whenever it implements policies or

takes actions that might impact of the segregation of schools.[138]

---

[137] It should be noted that student assignment is also an issue of concern raised by the BRAC.  *See, e.g.*, BRAC May 4, 2009 Ltr. at 2 (listing RISD's "racially identifiable schools" as a concern and noting that "the BRAC is compelled to ask about existence of other factors [other than demographic changes] that may have resulted in perpetuating this racial distribution" and "question[ing] whether any current RISD policies/actions have a compelling effect on th[e] racial distribution" of the students).  The District promised to study this issue the following year, but there is nothing to indicate that such a student was undertaken.  Indeed, the District has been slow to respond to the BRAC's concerns.  *See, e.g.,* BRAC Jan. 29, 2009 Ltr. at 2 ("These issues [related to faculty hiring] were raised in our May 29, 2008 letter to this Board, to which we have received only an acknowledgement."); *but see Singleton*, 541 F.Supp. at 913 (citing testimony establishing "that the School District makes extensive use of biracial committees in making management level decisions.").  As stated by the Fifth Circuit, "school desegregation is one area in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy."  *Jones v. Caddo Parish*, 704 F.2d 206, 221 (5th Cir. 1983).  Thus, courts routinely establish bi-racial advisory committees in desegregation cases to serves an advisory function and to create a cooperative atmosphere, where all of the stakeholders in the case work together to achieve the goal of unitary status.  *See, e.g., Jones v. Caddo Parish Sch. Bd.*, 499 F.2d 914, 915 (5th Cir. 1974); *see also United States v. Hinds Cnty. Sch. Bd.*, 433 F.2d 611 (5th Cir. 1970); *Acree v. County Bd. of Educ. of Richmond Cnty.*, 429 F.2d 387, 388 (5th Cir. 1970) (ordering the "Board of Education, together with counsel, to confer with H.E.W. representatives, the bi-racial advisory committee and other counsel of record in the formulation of a terminal desegregation plan for the … school system").  Here, the BRAC has repeatedly expressed frustration and "deep concern" with the District over the "glacial" pace of its attention to issues in this case.  BRAC May 29, 2008 Ltr. at 1 ("For too many years, this committee has patiently listened to all the reasons why it is difficult to hire minority teachers").  This apparent lack of responsiveness by RISD is evidence of the District's good faith commitment to the Court's orders and the principles of equal protection.

[138] *Harris*, 968 F.2d at 1095 ("the duty to desegregate is violated if a school board fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities."); *see also Swann*, 402 U.S. at 21 ("it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system"); *Hull*, 1 F.3d at 1459; *Anderson*, 232 F.3d at 453.

## B.        Student Assignment Within Schools

A basic precept of desegregation law states that "[a] school district may not segregate students within a putatively integrated school by educating them in racially imbalanced classes or programs that are separate, isolated and insulated educational units,"[139] and courts routinely find within-school segregation unlawful in various types of programs.[140]  Indeed, the Court's 1970 Order expressly prohibited the District from "maintaining any classroom … on a segregated basis, so that no student is effectively excluded from attending any class … on the basis of race."[141]  Thus, the District has an affirmative obligation to ensure that its classroom placement policies, including its academic honors programs, "do not become a means by which students become resegregated in classrooms, although they attend school on desegregated campuses."[142]  RISD, however, has not maintained desegregated classes and many of its academic programs, including its gifted and talented program and its Advance Placement (AP) classes are racially disparate.[143]

---

[139] *People Who Care v. Rockford Bd. of Educ.*, 851 F. Supp. 905, 1024 (N.D. Ill. 1994), *aff'd in part, rev'd in part on other grounds*, 111 F.3d 528 (7th Cir. 1997) (citing *United States v. Yonkers Bd. of Educ.*, 624 F.Supp. 1276, 1460 (S.D.N.Y. 1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987)); *see also McNeal v. Tate Cnty Sch. Dist.*, 508 F.2d 1017, 1019 (5th Cir. 1975) (noting "the basic rule that classrooms which are segregated by race are proscribed regardless of the degree of overall schoolwide desegregation achieved") (citing *Adams v. Rankin County Bd. of Educ.*, 484 F.2d 324 (5th Cir. 1973); *Boykins v. Fairfield Bd. of Educ.*, 457 F.2d 1091 (5th Cir. 1972)); *Johnson v. Jackson Parish Sch. Bd.*, 423 F.2d 1055, 1056 (5th Cir. 1970) ("We think that it was manifestly clear that the decisions of the Supreme Court and this Court required the elimination of not only segregated schools, but also segregated classes within the schools."); *Acree v. County Bd. of Educ. of Richmond Cnty.*, 458 F.2d 486, 488 n. 3 (5th Cir. 1970) ("of course [a constitutional violation] is not to be ameliorated by such practices as segregation by race in the classroom.").

[140] *See, e.g., Spangler v. Pasadena City Bd. of Educ.*, 311 F.Supp. 501, 519 (C.D.Cal. 1970) (gifted and ability grouping); *Yonkers*, 624 F.Supp. at 1443-46 (vocational programs); *Hart v. Cmty Sch. Bd. of Brooklyn, New York Sch. Dist. No. 21*, 383 F.Supp. 699, 740 (D.C.N.Y. 1974) (tracking).

[141] 1970 Order at 6.

[142] *Tasby*, 869 F.Supp. at 466 (a district should "carefully monitor the objective and subjective selection process for such programs to insure that no student or racial group is unfairly excluded."); *see also Castaneda v. Pickard*, 648 F.2d 989, 994 (5th Cir.1981) ("if testing or other ability grouping practices have a markedly disparate impact on students of different races and a significant racially segregative effect, such practices cannot be employed until a school system has achieved unitary status and maintained a unitary school system for a sufficient period of time that the handicaps which past segregative practices may have inflicted on minority students and which may adversely affect their performance have been erased") (citing cases).

[143] For the purposes of this Opposition, the United States examines the District's honors program and notes that additional discovery will be needed concerning the District's placement policies for regular academic classes.

Racial disparities are prevalent in the placement of elementary students into RISD's gifted and talented program, known as REACH, with white students making up the vast majority (74.6%) of students assigned to the program during the 2007-08 school year.[144]  At Hamilton Park, for example, African-American students made up 40.2% of the population, but only 10.8% of the students assigned to REACH.[145]  By contrast, white students who made up only 31.7% of the student body comprised 75.3% of the REACH students – more than double the proportion of their enrollment.[146]  At Big Springs – where the African-American made up 22.0% of the student population and white students made up 49.0% of the school population – 78.9% of the REACH students were white, while only 1.8% of the REACH students were African-American.[147]

RISD's data indicates that African-American students are placed in REACH at a disproportionately low rate in 34 of the District's 41 elementary schools.[148]  In 31 of those schools, the disparity exceeds 20% relative to the African-American student population.[149]  By contrast, white students at 32 of the elementary school are placed into the REACH program more frequently, relative to their share of the population, and this upward disproportionality exceeds 20% of the white population in all but six of those schools.[150]

The average white student at RISD is more likely to be placed into the REACH program relative to the average African-American student.  A typical African-American student assigned to Hamilton Park had only a 3.3% chance of being placed into REACH, while a white student at

---

[144] *See* Pls' App. at US 023.  For the purposes of this Opposition, the United States does not examine the District's QUEST program, which is operated as an enrichment program for students who are not placed into the REACH program; both programs will be examined through discovery.
[145] *See* Pls' App. at US 023.
[146] *See id*.
[147] *See id*.
[148] *See id*.
[149] *See id.*
[150] *See id.*

the same school had a 29.2% chance of being placed into the program.[151]  In fact, white students at the school were ***8.87 times*** more likely to be placed into REACH than their African-American counterparts.[152]  Likewise, white students at Wallace were 10.54 times more likely to be placed into REACH than an African-American student.[153]  A typical white student at Richland was 3.28 times more likely to be placed into REACH than an African-American student, even though more African-American students are assigned to the school.[154]

Racial disparities also are prevalent in the RISD's placement of secondary students into AP and Honors classes, with white students making up the majority (57.0%) of students assigned to such classes during the 2009-10 school year.[155]  At Lake Highlands Freshman Center, for example, African-American students made up 37.5% of the population, but only 14.1% of the students placed in AP and Honors classes.[156]  By contrast, white students who made up only 31.3% of the school's student population comprised 68.2% of the students in the school's AP and Honors classes – more than double the proportion of their enrollment.[157]  At Lake Highlands HS – where the African-American made up 35.8% of the student population and white students made up 34.8% of the school population – 69.7% of the AP and Honors students were white, while only 14.3% of the AP and Honors students were African-American.[158]  This trend is duplicated at the junior high schools.  At Forest Meadow, a racially identifiable Black school, African-American students make up 43.4% of the student body, but only 20.7% of the students

---

[151] *See* Pls' App. at US 024.
[152] *See id.*
[153] *See id.*
[154] *See id.*
[155] *See* Pls' App. at US 025.
[156] *See id.*
[157] *See id.*
[158] *See id.*

placed in AP and Honors classes.[159]  By contrast, white students only 21.4% of the student body,

but a majority (57.1%) of the AP and Honors students.[160]

RISD's data indicates that African-American students are placed in AP and Honors at a

rate disproportionate to their race in all of the high schools and all but two of the junior high

schools.[161]  In four out of the five high schools and five out of eight junior high schools, the

disparity exceeds 20% relative to the African-American student population.[162]  On the other

hand, white students at all but one of the junior high and high schools are placed into AP and

Honors classes more frequently, relative to their share of the population, and this upward

disproportionality exceeds 20% of the white population in each instance.[163]

The average white student at RISD is more likely to be placed in an AP or Honors class

relative to the average African-American student.  A typical African-American student assigned

to Lake Highlands HS had only a 43.2% chance of being placed into an AP or Honors class,

while a white student at the same school had a 217.0% chance of being placed is such a class.[164]

In fact, white students at the school were ***5.02 times*** more likely to be placed in an AP or Honors

class than their African-American counterparts.[165]  Likewise, white students at Pearce were 2.97

times more likely to be placed in an AP or Honors class than an African-American student.[166]  A

typical white student at Lake Highlands Freshman Center was 5.80 times more likely to be

placed in an AP or Honors class than an African-American student, even though more African-

American students are assigned to the school.[167]  Similarly, African-American students assigned

---

[159] *See id.*
[160] *See id.*
[161] *See id.*
[162] *See id.*
[163] *See id.*
[164] *See* Pls' App. at US 026.
[165] *See id.*
[166] *See id.*
[167] *See id.*

32

to Forest Meadow had only a 58.8% chance of being placed into an AP or Honors class, while white students at the school had a 329.3% chance of being placed is such a class.[168]

### C.    Faculty and Staff Recruitment and Assignment

#### 1.    Faculty and Staff Recruitment

A school district's policies and practices concerning the recruitment and assignment of its faculty and staff are "among the most important indicia of a segregated system."[169]  Thus, RISD has an affirmative duty to ensure that its "[p]rincipals, teachers, teacher aides and other staff who work directly with children" are not assigned in a manner that reinforces the racial identifiability of the District's schools.[170]  Indeed, any efforts to desegregate a district's schools would be "fatally undermined" if the district was permitted to continue segregating its faculty and staff.[171]  In assessing whether a district has complied with its duty, courts routinely examine policies and practices concerning faculty and staff recruitment and assignment to schools.[172]

As an initial matter, courts have recognized that students are entitled to a "sustained good faith effort to recruit minority faculty members so as to remedy the effects of any past

---

[168] *See id.*  The data the United States received from the District did not identify individual students were presumably counted multiple times based on their enrollment in different honors or AP classes.  Nevertheless, such duplications would be true for both white and African-American students.

[169] *Swann*, 402 U.S. at 18; *see Green*, 391 U.S. at 435; *see also* Arthur v. Nyquist, 712 F.2d 809, 821 (2d Cir. 1983), *cert. denied*, 466 U.S. 936 (1984) ("The Board of Education had consistently hired a disproportionately small percentage of minority staff members, and had intentionally assigned these minorities to schools with large minority bodies.  Such discriminatory policies are important indicia of a segregated school system.").

[170] 1970 Order at 3; *see Singleton v. Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211, 1218 (5th Cir. 1969); *Anderson*, 517 F.3d at 303; *see also Robinson v. Shelby Cnty. Bd. of Educ.*, 566 F.3d 642, 656 (6th Cir. 2009) ("Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff … a prima facie violation of substantive constitutional rights under the Equal Protection Clause is shown.") (quoting *Swann*, 402 U.S. at 18); *Evans v. Buchanan*, 582 F.2d 750 (3d Cir. 1978) (en banc) (districts must "insure that schools do not retain their former racial identity through racially identifiable faculty and staff assignments").

[171] *Lee v. Macon County Bd. of Educ.*, 453 F.2d 1104, 1110 (5th Cir. 1971); *see also United States v. Montgomery Cnty. Bd. of Educ.*, 395 U.S. 225, 232 (1969) (desegregation of school personnel is critical to "the basic task of achieving a public school system wholly free from racial discrimination"); *Vaughns v. Bd. of Educ. of Prince George's Cnty.*, 742 F.Supp. 1275, 1291 (4th Cir. 1990) ("It is obvious that the faculty assignment policy constitutes an integral part of the Board's effort to meet its continuing duty to attain unitary status").

[172] It should be noted that the District's Motion addresses the issue of faculty/staff recruitment, but fails to mention the issue of assignment; thus, it has failed to carry its burden of proof with respect to this critical *Green* factor.

discriminatory practices."[173]  Indeed, the District acknowledges the importance of recruiting and

hiring a highly qualified and diverse faculty.[174]  However, only 8% of the District's faculty is

African-American, and RISD has made little progress addressing the issue of minority

recruitment, an issue the BRAC has tried to for several years to remedy.[175]

While additional discovery will be required to determine why the District has not hired more

minority faculty, the District admits RISD "traditionally has been a very attractive employer in the

Metroplex" and has proffered no evidence that the relevant applicant pool is shrinking or that

qualified minority candidates are no longer part of that pool.[176]  Indeed, certain RISD administrators

stated during the United States' site visit that they had no problem identifying and hiring minority

faculty, and records maintained by the State of Texas appear to undercut RISD's claims that the

pool of minority applicants is limited.  RISD is adjacent to three school districts – Garland ISD to

the east, Dallas ISD to the south and west, and Plano ISD to the north – and about 18% of the

faculty employed by each of these districts during the 2007-08 school year were African-

American.[177]  There also are lingering questions concerning RISD's recruitment at Historically

---

[173] *Robinson*, 566 F.3d at 655 (quoting *Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1140 (5th Cir. 1981)); *cf. Tasby*, 869 F.Supp. at 469 (finding school district complied with order to "continue to make diligent efforts to recruit, retain, and certify qualified Black and Hispanic teachers."); *see also Anderson*, 517 F.3d at 304 (noting favorably the district's "extensive minority recruitment efforts", which included recruitment at predominantly African-American colleges and universities; *Morgan v. Nucci*, 831 F.2d 313, 327 (1st Cir. 1987) (requiring school board to continue "active recruiting program designed to attract black faculty" and achieve maximum practicable desegregation); *N.A.A.C.P., Jacksonville Branch v. Duval Cnty. Sch.*, 273 F.3d 960, 967 (11th Cir. 2001) ("It is undisputed that the Board aggressively recruited black faculty and staff and has achieved the [] goal of a 70% to 30% faculty racial composition system-wide.").

[174] *See* Defs' Mot at ¶ 61.

[175] *See id.* at ¶ 41; BRAC May 29, 2008 Ltr. at 1 ("It is the opinion of this committee that the pace of these changes [related to the recruitment of minority teachers] has been glacial at best" and recommending that the District develop a multi-year plan to proactively recruit minority staff); BRAC Jan. 29, 2009 Ltr. at 1 (recommending that the District "[e]stablish benchmarks and goals in the recruitment of minority faculty and administrators."); BRAC May 4, 2009 Ltr. at 1 (raising concern about the low percentage of minority teachers employed by the District).

[176] *See* Defs' Mot. at ¶ 61.  To the extent the District is trying to rely on testimony concerning competitive hiring that was offered to the court in *Flax*, the United States notes that such testimony is outdated by more than 20 years. The District's remaining proffer is riddled with uncited and, therefore, unsubstantiated assertions.

[177] The Texas Education Agency (TEA), through its Academic Excellence Indicator System (AEIS), compiles annual staffing data from each of the state's school districts.  According to AEIS Reports contained on the TEA website, the ethnic composition of the teaching staffs of Richardson ISD's neighboring districts is: Garland ISD

34

Black Colleges and Universities (HBCUs).  For example, RISD does not recruit from a number of

HBCUs that are located within a reasonable distance from RISD.[178]

Discovery also will be needed on facts not addressed by the District's Motion.  For example,

it is the United States' understanding, based on its site visit, that RISD employs a decentralized

hiring process for teachers: the District receives and reviews the applications for minimum

qualifications (*e.g.*, teaching certificates), and then distributes them to school-level administrators,

who decide whether applicants will be interviewed and/or hired.  It is unclear whether the District

offers school-level administrators any guidance concerning RISD's desegregation obligations.[179]

Also, it is the United States' understanding that RISD does not maintain records on the race of

individuals who apply for employment with the District;[180] its claims concerning the strength of its

minority recruitment are thus little more than hollow suppositions.  The District's failure to track

---

(10.5% Black, 74.0% White, 12.6% Hispanic); Dallas ISD (39.6% Black, 36.8% White, 21% Hispanic); Plano ISD (4.9% Black, 83.5% White, 7.9% Hispanic). *See* 2007-08 AEIS District Reports, http://ritter.tea.state.tx.us/ perfreport/aeis/2008/district.srch.html.  Despite the District's claims, the noncontiguous school districts located further north, *see* Defs' Mot. at ¶ 61, do not employ a larger number of African-American teachers: Allen ISD (2.7% Black, 90.4% White, 4.4% Hispanic); McKinney ISD (5.1% Black, 85.7% White, 7.6% Hispanic); and Frisco ISD (2.9% Black, 91.7% White, 4.1% Hispanic). *See* 2007-08 AEIS District Reports.  Regardless, even assuming *arguendo* that these three districts hire from the same employment pool as RISD, about 11% of the faculty employed by each of the six districts during the 2007-08 school year were African-American.

[178] According to the District, it recruits at Louisiana State University, which is located almost 375 miles from RISD. *See* Pls' App. at US 027.  However, the following HBCUs are not located on a document that purports to be the District's "Minority Recruiting Sites": Texas College (90 miles); Wiley College (140 miles); and Huston Tillotson University (200 miles). *Compare* U.S. Dep't of Educ., List of HBCUs - White House Initiative on Historically Black Colleges and Universities, http://www2.ed.gov/about/inits/list/whhbcu/edlite-list.html *with* Pls' App. at US 027.  Moreover, certain universities are included on the "Minority Recruiting Sites," but do not appear to be listed on RISD's actual recruitment schedule, such as Texas Southern University. *Compare* Pls' App. at US 027 *with* Pls' App. at US 028.  Also, it is unclear from the District's recruiting schedule whether RISD actually attends the New Orleans Area Fair and whether this fair includes HBCU, such as Southern University at New Orleans and Xavier University.  Finally, several of the universities listed on RISD's "Minority Recruiting Sites" are not, in fact, majority-minority institutions, such as the University of Arkansas, which had a minority enrollment of only 15.5% as recently as 2010. *See* Pls' App. at US 028; Administrative News, *University's Largest Student Body Is Also Its Most Diverse*, Univ. of Arkansas: Newswire (Sep. 13, 2010), http://newswire.uark.edu/article.aspx?id=14628 (reporting that the university has a 78.5% Caucasian enrollment).

[179] It is unclear whether the District offers principals any guidance on how to make hiring determinations and their obligations under the desegregation order.  *Cf Anderson*, 517 F.3d at 304 (citing testimony confirming that "'every principal is keenly' aware of Singleton's requirements and the requirements of the 2000 consent order as it relates to faculty hiring.").  Moreover, it is the District who are responsible for eliminating the vestiges of a *de jure* system, and RISD's central office may not escape this duty by delegating to the responsibility for hiring and assigning faculty and staff to school-level administrators.

[180] *But see* EEOC Form 164, State and Local Government Information (EEO-4) Instruction Booklet.

such data makes it virtually impossible for the Court to determine whether RISD's low minority

faculty numbers are attributable to a problem in the District's recruitment or its hiring practices.

### 2.    Faculty and Staff Assignment

Even if the District can prove that it adequately recruits and retains qualified minority

teachers and staff, it is not entitled to a declaration of unitary status because RISD assigns its faculty

and staff in a manner that reinforces the racial identifiability of its schools.[181]   To dismantle a dual

school system and "vindicate the rights of school children," a district may employ race-conscious

faculty recruitment and assignment policies if such policies are designed to reduce the racial

identifiability of the district's schools.[182]   The District has an affirmative duty to ensure that its

faculty and staff assignment decisions do not perpetuate the racial identifiability of its schools, and

RISD must bear the burden of showing that any imbalance in these areas is not traceable to the prior

violation.[183]   RISD is unable to carry this burden because it assigns its faculty and staff in a manner

that mimics its student assignment.[184]

The beginning point in assessing faculty and staff assignments in a desegregation case is

determining the extent to which the racial composition of the faculty/staff at the schools deviates

---

[181] *See Anderson*, 517 F.3d at 303 ("a school must show that faculty and staff who work directly with children are assigned in such a manner that the racial composition of the faculty and staff would not indicate that the school is intended for either African-American or white students.") (citing *Singleton*, 419 F.2d at 1217-18).

[182] *Vaughns*, 742 F.Supp. at 1292; *see Montgomery Cnty.*, 395 U.S. at 232; *Davis v. Board of Sch. Comm'r*, 402 U.S. 33 (1971); *Swann*, 402 U.S. at 19; *cf. Tasby*, 869 F.Supp. at 469 (citing judgment that required district to employ faculty and staff "so that the racial representation is 40% Anglo, 40% Black, and 20% Hispanic.").

[183] *See Duval Cnty.*, 273 F.3d at 966.  While courts prefer to avoid "'strict mathematical ratios,' their effectiveness as starting point in eliminating the vestiges of segregation in … faculty assignment is beyond question.'" *United States v. DeSoto Parish Sch. Bd.*, 574 F.2d 804, 818 (5th Cir. 1978); *cf Anderson*, 517 F.3d at 303-04 ("The 2000 consent order required the MCSD to meet its Singleton obligation by ensuring that the faculty composition at each school in the district is within a 15% range of the district-wide ratio of African-American to white teachers."); *Tasby*, 869 F.Supp. at 472 (discussing order that used a +/– 2.5% variance and evidence regarding both a  +/–10% and a +/–15% variance); *Flax*, 725 F.Supp. at 326 ("In 1988, the variance rate of black to white faculty members was modified to permit a variance of up to 20% in any one school.").

[184] *See DeSoto Parish*, 574 F.2d at 811 (requiring strict compliance with the *Singleton* requirements after finding that five formerly black schools had "substantially higher percentage of black faculty" than formerly white schools and no formerly white school had a "black faculty percentage greater than 31 percent"); *see also Freeman*, 503 U.S. at 497 ("We have observed … that student segregation and faculty segregation are often related problems.") (citing *Brinkman*, 443 U.S. at 526); *Quarles v. Oxford Mun. Sep. Sch. Dist.*, 868 F.2d 750, 757 (5th Cir. 1989) ("students do not have a constitutional right to attend a school with a teaching staff of any particular racial composition.").

from the race of district-wide faculty/staff for the comparable grade levels, *e.g.*, elementary, junior high, and high schools.[185]  Using this analysis, it is evident that RISD assigns its certified African-American faculty and staff to its racially identifiable Black schools, thus furthering the racial identifiability of all of its schools.

During the 2007-08 school year, none of the 11 racially identifiable white elementary schools had an African-American principal or assistant principal – every single one had a white principal and/or assistant principal.[186]  On the other hand, all but two of the 10 racially identifiable Black elementary schools had an African-American principal or assistant principal.[187]  In fact, 75% of RISD's elementary level African-American principals and assistant principals were assigned to racially identifiable Black schools.[188]  Likewise, all but one of the District's other elementary level certified African-American staff were assigned to schools with a majority African-American student body.[189]

During the 2009-10 school year, RISD assigned a significant percentage of its African-American faculty to racially identifiable Black schools, such as Audelia Creek (11), Stults Road (13), and Thurgood Marshall (13), as well as Hamilton Park (11), which was the District's historically Black school under the *de jure* system.[190]  These four schools employ more than a third of the District's 117 African-American elementary level teachers, and 64% of RISD's African-

---

[185] *See e.g., Vaughns*, 742 F.Supp. at 1295 (ordering school board's faculty assignment policy to be based on the racial composition of the systemwide teaching population); *see also Robinson*, 566 F.3d at 655 ("the faculty of each school [should] reflect the systemwide racial ratio of faculty members.").

[186] *See* Pls' App. at US 029.  During the 2007-08 school year, Arapaho Classic also had a disproportionatly high white student enrollment and no African-American principal or assistant principal.

[187] *See* Pls' App. at US 029.  Forestridge and Merriman Park did not have African-American administrators in 2008.

[188] *See* Pls' App. at US 030.

[189] *See id*.  The remaining African-American staff member was assigned to Forestridge, which is a racially identifiable Black school but did not have a majority Black student population during the 2007-08 school year.

[190] *See* Pls' App. at US 031.  These represent only the double-digit placements of African-American teachers at the elementary schools.

American elementary level teachers are assigned to racially identifiable Black schools.[191]  Likewise, at the junior high school level, more than half of the African-American junior high teachers were assigned to two of RISD's eight junior high schools – Forest Meadow (12) and Lake Highlands (9) – that also happen to serve 45% of the District's African-American junior high students.[192]  RISD's teacher placement decisions also reinforce the identifiability of the schools that have a majority white student population.  Bowie, Bretfield, Mohawk, Prairie Creek, Spring Creek, and Yale, which are all racially identifiable white schools, are the only schools with a 95%-100% white faculty.[193]

### D.   Quality of Education

RISD has failed to carry its burden of proof with respect to the quality of education provided to students.[194]  The District offered a blanket assertion regarding RISD's "commitment to serving all students" without examining the racial disparities in its academic programming.[195]  The District did not produce any evidence that it has taken affirmative steps to eliminate the racial gap in the academic performance of its students.  Instead, RISD points to performance indicators, which do not provide the Court with the full explanation of the issues that must be examined in this case.

As an initial matter, the District's relies exclusively on indicators of academic performance, such as Texas Essential Knowledge and Skills (TEKS) scores, which fail to account for factors the Court is expected to examine, such as: (1) teacher quality, as measured by years in service, certification, and training; (2) program development, which includes the siting and design of unique

---

[191] *See* Pls' App. at US 031 (Aikin (3), Audelia Creek (11), Forest Lane Academy (6), Hamilton Park (11), Northlake (8), Richland (6), and Skyview (5), Stults Road (13), and Thurgood Marshall (13)).

[192] *See* Pls' App. at US 031; *id*. at US 002.

[193] *See* Pls' App. at US 031.  It should be noted that faculty assignment is also an issue of concern raised by the BRAC. *See, e.g.*, BRAC May 29, 2008 Ltr. at 1 (concluding that "efforts [be] made to place minority teachers and staff in schools where they have been historically underrepresented" and recommending that the District make the development and implementation of a staff assignment plan "a top priority"); BRAC May 4, 2009 Ltr. at 1 (raising concern about the assignment of minority teachers).

[194] The District correctly notes that issues related to "quality of education" are often examined in desegregation cases. *See* Defs' Mot at ¶ 87 (citing *Freeman*, 503 U.S. at 482-83).

[195] Defs' Mot at ¶ 88.

and innovative academic initiatives; and (3) professional development.[196]  The Court also should examine whether the District has a practice of steering African-American students toward vocational programs and away from higher academic programs.[197]  These factors, among others, relate directly to the type of resources RISD provides to support the academic performance of its students and will need to be examined through discovery.  While academic performance measures – output measures – are relevant to identifying potential areas of concern regarding the quality of RISD's academic programs, any inquiry into quality of education issues will need to focus on educational inputs; factors which are wholly within the control of District administrators and staff.

To the extent the District does rely on the TAKS performance indicators and school ratings to support its Motion, RISD's recent TAKS scores/ratings, which are reported in AEIS data compiled by the State,[198] reveal a stark and unexplained racial disparity.  In fact, for virtually every TAKS assessment for 2009 and 2010, African-American students perform at a lower rate than white students.[199]  For example, the 2010 report of fifth grade students for all tests indicate that African-American students scored 85% while white students scored 97%; at the seventh grade, African-American students scored 73% while white students scored 96%; and at the tenth grade, African-American students scored 64% while white students scored 94%.[200]  RISD's annual performance report indicates that in 2009, only 79.7% of the District's African-American students graduated

---

[196] See Belk, 269 F.3d at 330 (addressing "teacher quality" as an "ancillary factor" in a school desegregation case); but see id. at 331 (observing that "to the extent that low achievement [by African-American students] is linked to other factors [outside the district's control], it is beyond the reach of the court's authority.").

[197] See e.g., Yonkers Bd. of Educ., 624 F.Supp. at 1444-53; see also BRAC Jan. 29, 2009 Ltr. at 2 (expressing concerns about the lack of a technology-related Career and Technology Education program at Lake Highlands High School).  The District established a "cosmetology" program at Lake Highlands, the high school with the largest African-American student enrollment, while it placed a "geographic information systems" program at Pearce, the majority white high school.  See RISD, Career and Technology, http://www.risd.org/Group/Departments/ Instructional_Technology/CareerTechnology.html.

[198] See 2009-10 Academic Excellence Indicator System: District Reports, available at  http://ritter.tea.state.tx.us/ perfreport/aeis/2010/district.srch.html.

[199] See id.  The only exception was the 2010 eleventh grade TAKS for Social Studies, where both African-American and white students received a 99% assessment score.

[200] See id.

(after four years), while 94.0% of the white students graduated.[201]  To the extent RISD relies on the

TAKS school rating system to support its Motion, the District's 2011 TAKS ratings reveal an

evident racial disparity.  Specifically, at the elementary level, 90% (9 of 10) of the District's racially

identifiable white schools received the highest TAKS rating of "Exemplary."[202]  By contrast, only

30% (3 of 10) of RISD's racially identifiable Black schools received such a rating; the remaining

seven schools received the lower rating of "Recognized."[203]  As noted above, these performance

measures highlight racial disparities, which the District has failed to explain.

### E.    Student Discipline

RISD has offered no evidence that it has undertaken any efforts to address glaring racial

disparities in the administration of its student discipline policies.[204]  In support of its Motion, the

District only proffers the truism that "[d]iscipline is a very complex area" and that RISD reports

its student discipline data to the Texas Education Agency on a yearly basis, as required by state

law.[205]  Surprisingly, RISD makes no effort to address the racial disparities that exist within its

system of discipline, an issue the BRAC has tried to remedy unsuccessfully for several years.[206]

---

[201] *See id.*

[202] *See* RISD, *Accountability Ratings for 2011 by Campus*, http://www.risd.org/group/schools/schools_main.html.

[203] *See id.*

[204] *But see Lee v. Auburn City Bd. of Educ.*, No. Civ. A.70-T-851-E, 2002 WL 237091, at *7 (M.D.Ala., Feb. 14, 2002) (finding the district unitary after it cooperation with the regional Equity Center to institute diversity training for its staff, workshops on classroom management for new teachers, and a disciplinary referral review process, which dramatically reduced the number of suspensions of Black students).

[205] *See* Defs' Mot. at ¶ 97.  The District claims that the 1970 Order does not specifically address student discipline, but appears to concede that the Court may examine this issue in determining whether the District is unitary.  *But see* 1970 Order at 6 (prohibiting the District "from maintaining any classroom [or] non-classroom … activity on a segregated basis, so as that no student is effectively excluded from attending any class or participating in any non-classroom … activity on the basis of race."); *see also United States v. Bd. of Pub. Instruct. of St. Lucie Cnty.*, 977 F.Supp. 1202, 1222-23 (S.D.Fla. 1997) (discussing court-appointed experts examination of student discipline when evaluating district's compliance with an order that prohibited the district "from maintaining any classroom [or] non-classroom … activity on a segregated basis, so as that no student is effectively excluded from attending any class or participating in any non-classroom … activity on the basis of race.").  The United States notes that student discipline is often considered in the context of student assignment because it has the effect of removing students from the classroom setting.  *See e.g.*, *Hoots v. Pennsylvania*, 118 F.Supp.2d 577, 609 (W.D. Pa. 2000) ("Certainly, excessive volume [of discipline] is a concern since it falls disproportionately on African–American students, removing them from instruction."); *see also Berry v. Sch. Dist. of City of Benton Harbor*, 515 F.Supp. 344, 379 (D.C.Mich. 1981)

When determining whether disparities in student discipline are caused by vestiges of segregation, courts routinely examine several factors, including the extent to which the district's disparities conform with national trends, any parity between mandatory and discretionary or subjective categories of discipline, and any trainings and reforms undertaken by the district to address issues of bias, through policy modifications and training designed to address racial disparities.[207] Even based on the limited data the District provided to the United States concerning its discipline policies and practices, it is clear that RISD's rate of disproportionality outpaces the national average, that the rate of disparity in discretionary discipline is twice the rate in mandatory discipline, and that no meaningful training or serious reforms to the Student Code of Conduct have been undertaken by the District.[208]   Indeed, the data reveals that RISD not

("Students' perception of and feeling of fairness in the schools is absolutely critical to the success of this or any desegregation plan.").

[206] *See, e.g.*, BRAC May 29, 2008 Ltr. at 2 (noting that "[t]here continues to be a disproportionate number of minority students represented in the discipline data" and strongly recommending the "establishment of a District-wide task force for staff development in diversity training"); BRAC Jan. 29, 2009 Ltr. at 2 (noting that "[f]or many years, there has been disproportionate number of minority students represented in the discipline data" and recommending that the District "[e]stablish benchmarks and goals to close the gap in discipline."); BRAC May 4, 2009 Ltr. at 2 ("The BRAC also has ongoing concern in regard to effective student disciplinary action, and its equitable application across the District without regard to race or ethnicity.").

[207] *See Coalition to Save Our Children v. State Bd. of Educ.*, 90 F.3d 752, 775 (3rd Circ. 1996); *Reed v. Rhodes*, 1 F. Supp. 2d 705, 723 (N.D. Ohio 1998); *Hoots*, 118 F.Supp.2d at 609; *Keyes v. Congress of Hispanic Educs.*, 902 F.Supp. 1274, 1303 (D.Colo. 1995); *Lee*, 2002 WL 237091, at *7; *see also Tasby*, 643 F.2d at 1107-08.

[208] The United States will require additional discovery regarding the District's discipline policies and practices, including discovery on RISD's discipline data.  In response to the United States' 2008 information request, RISD produced only the annual data it provided to the State for the 2006-07 and 2007-08 school years, which is collected as part of the Public Education Information Management System (PEIMS); this report contains data on only 25 of the PEIMS Discipline Reason Codes.  The District did not, however, provide the United States with data related to the Local Reason Codes, which documents behavior, such as tardiness, excessive absences, and persistent misbehavior.  Also, during the United States' site visits, District employees stated that a breakdown of the Reason Code 21 (a discretionary discipline category for Violations of Code of Conduct), which represents the vast majority of the RISD discipline, was only available in the individual student files.  According to the District, it does not maintain centralized records indicating whether, for example, an individual Reason Code 21 discipline was base on a dress code violation or an instance of disrespect.  Moreover, the data the United States was limited to in-school suspensions, out-of-school suspensions, and referrals to the District's disciplinary alternative education program (DAEP); the data did not contain information concerning other PEIMS Action Codes, which would document different types of punishments, such as detention and parent-teacher conferences.  Nor did it indicate the number of students who were disciplined on multiple occasions.  Nevertheless, for the purposes of this Opposition, the data is sufficient to demonstrate that RISD has significant racial disparities in its student discipline and any limitations in the current data set, such as the lack of data on recidivism, is a weakness that applies equally to data on both African-American and white students.

only disciplines African-American students with disproportionate frequency and severity, but also has adopted and failed to modify a Student Code of Conduct that contains vague provisions, is subject to arbitrary changes, and inexorably leads to racially disproportionate discipline.

The Fifth Circuit has held that evidence of disparate racial impact provides an "important starting point" in the evaluating student discipline, and the District is not entitled to a declaration of unitary status in the area of discipline when such disparities are attributable to the actions of the RISD and its employees.[209]  Not only are the data wildly disproportionate – with African-American students at some schools being nine times more likely to face discipline than white students[210] – but the disparities far exceed the average disparities observed nationally.[211]  In addition, RISD levies "discretionary" discipline in a racially disparate fashion.[212]  In fact, the disparity between African-American and whites in the category of "discretionary" discipline far exceeds any racial disparity in the category of "mandatory" discipline, with the African-American students in the District being twice as likely as white students to face mandatory discipline but nearly ***four times*** as likely to face discretionary discipline.[213]

---

It should be noted that the District's failure to maintain comprehensive records of its disciplinary actions shed significant doubt on whether the District can make any credible assertions concerning the elimination of racial disparities in the area of discipline.  Indeed, without accurate data it is virtually impossible for RISD to seriously assert that it has taken steps to remedy such disparities.

[209] *Tasby*, 643 F.2d at 1108 (noting that it is appropriate to place the burden on a school district to show that the disproportionate racial consequences of its decision were not the product of a racially discriminatory purpose when such disparities cannot be explained on grounds other than race).

[210] *See* Pls' App. at US 032.

[211] *See* Children's Defense Fund, *School Suspensions: Are They Helping Children?* 68-70 (1975) (noting that, in 1975, African-American students were two to three times more likely to be suspended than white students); Russell J. Skiba et al., *The Color of Discipline: Sources of Racial and Gender Disproportionality in School Punishment*, 34 Urban Rev. 317, 319-20. (2002) (confirming that African-American students are still disciplined at about this rate, almost thirty years later).

[212] Chapter 37 of the Texas Education Code requires all independent school districts to adopt a student code of conduct, *see* Tex. Educ. Code Ann. § 37.001, and established a discipline framework where districts were required to remove students for certain "mandatory" offenses, such as lewd behavior, selling alcohol, or hitting a teacher, *see id*. at § 37.006-007, but retained the authority to discipline students for other "discretionary" offenses, as set forth in the district's student code of conduct, *see id*. at § 37.005.

[213] *See* Pls' App. at US 033; *see also id*. at US 034.  It should be noted that multivariate analyses now enables researchers to control for different variables isolate the effect race has on disciplinary actions.  *See, e.g.*, Council of State Governments Justice Center, *Breaking Schools' Rules: A Statewide Study on How School Discipline Relates to*

The stark differences in the way RISD administers "discretionary" and "mandatory" discipline is particularly telling because it effectively mitigates the impact of ancillary, external factors other than discrimination.  The aggregate data presumably includes a healthy mix of students with different socioeconomic backgrounds, academic performances, and school attendance records; thus, the disparity must be attributable to decisions of RISD employees, and the District's vague and subjective Code of Conduct.  Nevertheless, the District has taken no significant steps to either revise its policies and reduce discretion or train its staff to ensure that the policy, in practice, is implemented in nondiscriminatory fashion.[214]  Instead, the District has maintained a system that disproportionately disciplines African-American students.

Indeed, notable disparities existed in each of RISD's secondary schools and in the vast majority of its elementary schools during the 2007-08 school year.[215]  At Berkner, for example, African-American students made up only 31.7% of the population, but 61.9% of Category 21 discipline for purported violations of the Code of Conduct was directed at them.[216]  By contrast, white students who made up 32.4% of the school's student population received only 12.4% of the discipline referrals.[217]  At Lake Highlands HS – where the African-American made up 43.9% of the student population and white students made up 32.8% of the school population – 67.7% of

*Students' Success and Juvenile Justice Involvement*, Executive Summary 10 (2011).  There is no indication, however, that the District has undertaken any such analysis of its discipline data.
[214] For several years, the BRAC has encouraged the District to eliminate the racial disparities in its discipline through training, but to no avail.  *See* BRAC May 29, 2008 Ltr. at 2 ("we feel that diversity training as a campus responsibility has proven itself to be ineffective" as a response to the disparities in disicipline); BRAC Jan. 29, 2009 Ltr. at 2 (stating that the BRAC "concluded that the campus-led diversity training put in place by RISD, and touted as a solution to this problem, is ineffective" and that "a District-wide task force charged with devising and implementing comprehensive diversity training for professional staff is desperately needed."); BRAC May 4, 2009 Ltr. at 2 ("the concern of the BRAC is whether policy changes and training reflects a long-term solution and commitment, or only temporary impetus brought about based on BRAC's concern.").
[215] *See* Pls' App. at US 035.  With the exception of two exhibits, *see id* at US 033-034, for the purpose of this Opposition, the United States relies on data from the 2007-08 school year; specifically, Category 21 (discretionary Violations of Code of Conduct), which triggered in-school suspensions, out-of-school suspensions, or placement in an alternative schools.
[216] *See* Pls' App. at US 035.
[217] *See id.*

the discipline being levied against African-American students, while only 8.9% of the discipline

was directed at white students.[218]  Lake Highlands JHS mirrored this trend, with 53.6% of the

Code of Conduct suspensions or referrals being levied against African-American students, but

***only 3.3%*** of suspensions or referrals being issued to white students.[219]

RISD's data indicates that students are disciplined at a rate disproportionate to their race

in every single junior high and high school.[220]  In four out of the five high schools and six out of

eight junior high schools, the disparity exceeds 20% relative to the African-American student

population.[221]  On the other hand, white students at every single junior high and high school are

disciplined less frequently, relative to their share of the population.[222]  This downward

disproportionality exceeds 20% of the white population at every single secondary school.[223]

The average African-American student at RISD is more likely to be disciplined relative

to the average white student.  A typical African-American student assigned to Lake Highlands

HS had a 56.9% chance of being disciplined, while a white student at the same school had only a

10.0% chance of being disciplined.[224]  In fact, African-American students at the school were 5.68

times as likely to be disciplined than their white counterparts.[225]  African-American students at

Berkner were over five times a likely to be disciplined.[226]  The disparities in several junior high

schools were even worse.  African-American students at Lake Highlands JHS were ***over nine***

***times*** as likely to be disciplined as white students.[227]  An African-American student had 53.7%

chance of being disciplined at the school, while a white student had a 5.8% chance of being

---

[218] *See id.*
[219] *See id.*
[220] *See id.*
[221] *See id.*
[222] *See id.*
[223] *See id.*
[224] *See* Pls' App. at US 032.
[225] *See id.*
[226] *See id.*
[227] *See id.*

disciplined.[228]   African-American students at Parkhill, a majority white school, were 6.3 times

more likely to be disciplined than the white students, and African-American students at

Richardson North were ***over seven times*** more likely to be disciplined than the white students at

the school.[229]

Moreover, when African-American students are disciplined, they face harsher

consequences than white students.  African-American students were more likely than white

students to face an out-of-school suspension, while white students were more likely than

African-American students to be suspended in-school for Code of Conduct violations.[230]   At

Berkner, for example, African-American students were 1.48 times as likely as white students to

receive an out-of-school suspension.[231]   The overall high school trend is similar, with African-

American students 163% more likely to get an out-of-school suspension, but only 8% as likely to

---

[228] *See id.*

[229] *See id.*  On average, RISD's junior high and high school African-American students were over four times more likely to be suspended for a Code of Conduct violation than white students. *See id.* (4.18 times at the high schools, and 4.04 times at the junior high schools)  In addition, the statistical probability that an African-American student would be suspended exceeded 100% in three of RISD's eight junior high schools; that is, the number of suspensions exceeded the number of African-American students at the schools.  *See id.*  At Forest Meadow, the District recorded 1,451 suspensions for 441 African-American students; an average of over three suspensions for every student.  *See id.*  The Liberty, 533 suspensions were recorded for 353 African-American students; an average of 1.5 suspensions for every student.  *See id.* Apollo recorded similar statistics, with 329 suspensions for 209 student students; around 1.5 suspensions per student.  *See id.*

[230] *See* Pls' App. at US 036-038; *see also* RISD, *The Student/Parent Guidebook and Student Code of Conduct*, at 39-65 (2010-2011), http://www.risd.org/Group/Parents/ Student_Services/GuidebookCode.html ("Code of Conduct"). The Code of Conduct states: "The length of an [out-of-school suspension] is left to the administrator's discretion, but will not exceed three school days.  There is no limit on the number of times a student may be suspended in a semester or school year."  *Id.* at 59.  However, the Code of Conduct does not indicate or offer any guidance on when a student should receive in-school suspension as opposed to out-of-school suspension, leaving such decisions to the discretion of the administrator.  In fact, it states that any of the District's "discipline management techniques may be used alone or in combination" to address any type of student Code of Conduct violation.  *Id.* at 47.  Thus, the District does not appear to employ a progressive discipline policy, whereby students are disciplined using increasingly more severe punishments.  Rather, the District may suspend a students without first using a less sever discipline, such as verbal redirection or conference with student, an oral or written correction, and/or a conference with parent.  *See id.*

[231] *See* Pls' App. at US 036.

receive the more lenient in-school suspension.[232]  African-American students were also twice as likely to be referred to an alternative school.[233]

Based on these disparities, the District is not entitled to a declaration of unitary status in the area of student discipline.  First, RISD's racial disparities in discipline exceed national rates.[234]  Most scholars estimate that on a national level African-American students are disciplined at two to three times the rate of whites.[235]  By contrast, the District's data reveal a far worse trend, with RISD suspending African-American students, on average, at about four times the rate of white students.[236]  At some of RISD's schools, the rate of African-American discipline is five, six, seven, or even nine times greater than for white students.[237]

Second, while RISD's rate of punishment for mandatory (*i.e.*, objective) discipline offenses is slightly higher for African American students,[238] the rate of discretionary discipline for African-American students is far higher.[239]  In fact, the rate of punishment of African-American students for discretionary offenses is nearly ***four times*** greater than for white students, well outside of the national average.[240]  It seems highly unlikely that student behavior alone accounts for the rate doubling, once RISD's vague Code of Conduct and teacher discretion come into play.

---

[232] *See id.*
[233] *See id.*
[234] *See Coalition to Save Our Children*, 90 F.3d at 775 (finding it probative that the district's rate of discipline was less disproportionate than the national or state average); *Reed*, 1 F. Supp. 2d at 723 (same).
[235] *See* Children's Defense Fund, *supra* note 211, at 68-70; Skiba et al., *supra* note 211, at 319-20.
[236] *See* Pls' App. at US 032.
[237] *See id.*
[238] RISD's rate of punishment for mandatory discipline of African-American students is about twice that of white students, but within the national range.
[239] *See Hoots*, 118 F.Supp.2d at 609 (finding it significant when the rate of mandatory punishment for more objective offenses exceed rates of punishment for discretionary, subjective offenses for black students); *Reed*, 1 F. Supp. 2d at 723 (same).
[240] *See* Pls' App. at US 033-034.

Third, the District has offered no evidence showing that it has attempted to remedy the glaring racial disparities in its discipline practices.[241]   Indeed, the District offers no proof that RISD has taken any steps to alter its existing policies and practices to address these disparities, despite repeated requests from the BRAC to that effect.[242]   Instead, the District has continued to use a Student Code of Conduct that allows African-American students to be disproportionately punished for vague, discretionary offenses, such as "engage[ing] in horseplay" or "scuffle[s]."[243]   Indeed, RISD allows school administrators to "impose campus rules in addition to those found in the Student Code of Conduct" that "may or may not constitute violations of the Code."[244]   Finally, the District has proffered no evidence that it intends to amend its discipline policies and practices to reduce the amount of discretion the teachers and building principals are currently permitted to exert or that it plans to offer training to its staff in a good faith effort to minimize existing racial disparities.[245]

---

[241] *See Auburn City*, 2002 WL 237091, at *7 (finding the district unitary after it cooperation with the regional Equity Center to institute diversity training for its staff, workshops on classroom management for new teachers, and a disciplinary referral review process, which dramatically reduced the number of suspensions of Black students).

[242] *See supra* note 214.

[243] *See* Code of Conduct at 45.  According to the Student Code of Conduct, these types of actions are considered Category I offenses.  *See id*.  The Student Code of Conduct also identified Category II offenses, which includes "[e]ngaging in serious misbehavior that affects the orderly environment of the school, not excluding conduct listed in Category I" and "[e]xhibiting persistent misbehavior."  *Id*. at 51.

[244] *Id*. at 46; *see also id*. at 40 ("Some campuses have developed school-specific guidelines on discipline management.").

[245] The Code of Conduct states that "RISD developed this Student Code of Conduct with input from administrators, teachers, and parents, and updates it annually," but the 2009-2010 version of the document appears to be identical to the 2007-2008 version the District provided to the United States.  Also, it should be noted that the Code of Conduct does not appear to require that parents be notified that their children may be disciplined *prior* to such punishments being levied.  *See* Code of Conduct at 47 (stating that parental notifications will occur "within three school days after the administrator becomes aware of the violation.").

47

IV.      CONCLUSION

For the aforementioned reasons, the United States respectfully requests that the Motion for

Declaration of Unitary Status filed by Defendant Richardson Independent School District be denied.

A proposed Order is being filed with this Opposition.[246]

                                        UNITED STATES OF AMERICA

                                        THOMAS E. PEREZ
                                        Assistant Attorney General

                                        s/ MARK A. DANN
                                        ANURIMA BHARGAVA, Esq.
                                        FRANZ R. MARSHALL, Esq.
                                        MARK A. DANN, Esq.
                                        U.S. Department of Justice
                                        Civil Rights Division
                                        Educational Opportunities Section
                                        950 Pennsylvania Avenue, NW
                                        Patrick Henry Building, Suite 4300
                                        Washington, DC  20530
                                        Tel.:  202-305-1231
                                        Fax:  202-514-8337
                                        Email: mark.dann@usdoj.gov

Filed this the 1 day of September 2011.          Attorneys for United States of America

---

[246] This case is not a new lawsuit, and the Court's June 27, 2011 Scheduling Order does not require the parties to serve initial disclosures.  *See* Scheduling Order (ECF No. 29) at 1; *see also* Pl's Stip. and Prop. Order (ECF No. 27) at 2 (noting that Rule 26(a)(1) disclosures are not necessary in this case).  Moreover, discovery period for this matter began with the issuance of the Court's Scheduling Order, *see* Scheduling Order (ECF No. 29) at 1; *see also* Order (ECF No. 28) at 2 (denying the parties' request for a 45-day abetment of the discovery period), and the forgoing Response provides Defendants with most of the pre-discovery information the United States is likely to rely on in opposing Defendants' Motion.

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on the  1st  day of  September , 2011, a true and correct copy of the foregoing Response In Opposition To Defendants' Motion For Declaration Of Unitary Status And Brief In Support was served on all counsel of record in the above-captioned matter by electronic means through the Court's ECF system and by depositing a copy of the same in the U.S. Mail, postage prepaid, at the following addresses:

Mia M Martin
Richardson ISD
400 S Greenville Ave
Richardson, TX  75081
mia.martin@risd.org

Marcos G. Ronquillo
Jose L Gonzalez
Godwin Ronquillo, P.C.
1201 Elm Street, Suite 1700
Dallas, TX  75270-2041
mronquillo@GodwinRonquillo.com

           s/ MARK A. DANN
           Mark A. Dann